Gregg Alan BENSHOFF; Zeno Nichols, Jr.; Paul Robert Criswell; Jeffrey L. Floyd; George Marshall; Alan G. Taylor; Alan Paul Walters, Plaintiffs–Appellants,

v.

**CITY OF VIRGINIA BEACH,** Defendant–Appellee.

Secretary of Labor, Amicus Curiae.

No. 98–1965.

United States Court of Appeals, Fourth Circuit.

Argued March 2, 1999.

Decided June 8, 1999.

138

**ARGUED:** Thomas Aquinas Woodley, Mulholland & Hickey, Washington, D.C., for Appellants. Stanley Graves Barr, Jr., Kaufman & Canoles, P.C., Norfolk, Virgi-
nia, for Appellee. **ON BRIEF:** Gregory K. McGillivary, Mulholland & Hickey, Washington, D.C., for Appellants. Robert J. Barry, Scott W. Kezman, Kaufman & Canoles, P.C., Norfolk, Virginia; Leslie L. Lilley, City Attorney, Richard J. Beaver, Senior Attorney, L. Stephen Emmert, Senior Attorney, City Attorney's Office for the City of Virginia Beach, Virginia Beach, Virginia, for Appellee. Henry L. Solano, Solicitor of Labor, Steven J. Mandel, Associate Solicitor, Paul L. Frieden, Counsel for Appellate Litigation, Leif G. Jorgenson, United States Department of Labor, Washington, D.C., for Amicus Curiae.

Before LUTTIG, MOTZ, and TRAXLER, Circuit Judges.

Affirmed by published opinion. Judge TRAXLER wrote the opinion, in which Judge LUTTIG and Judge MOTZ joined.

## OPINION

TRAXLER, Circuit Judge:

Plaintiffs, firefighters employed by the City of Virginia Beach (the "City"), appeal an order of the district court denying their motion for summary judgment and granting the City's cross motion for summary judgment on plaintiffs' claim that the City violated the Fair Labor Standards Act (the "FLSA" or "Act"), *see* 29 U.S.C.A. §§ 201—219 (West 1998), by refusing to pay them overtime wages for hours they volunteered to private rescue squads which provide emergency medical services within the City. *See Benshoff v. City of Virginia Beach,* 9 F.Supp.2d 610 (E.D.Va.1998). We affirm.

### I.

The material facts are not in dispute. Plaintiffs are seven master firefighters employed by the City. As such, the City requires them to be certified to render Basic Life Support ("BLS") services to individuals they encounter in the perfor-

mance of their duties.[1] Also, it is not uncommon for fire department units to be dispatched on medical emergency calls if, because of time or distance, they would be able to arrive before a rescue squad. In either case, however, the firefighters are only required to provide BLS services until a rescue squad licensed to provide Advanced Life Support ("ALS") or an ALS certified rescue squad member arrives on the scene.[2]

In order for its firefighters to provide BLS services, the City has obtained a non-transport BLS license from the Commonwealth of Virginia. The City does not, however, possess an ALS license and does not require its firefighters to become certified to provide ALS care. Rather, the City is unique in that pre-hospital emergency medical services, and associated transport services, are provided by private, all-volunteer rescue squads, and have been since the 1940s. Currently, there are eleven such rescue squads which have obtained the requisite licenses from the Commonwealth to provide ALS services. Each rescue squad is a separately incorporated non-profit entity, governed by its own board of directors and by-laws. Collectively, the rescue squads enjoy a volunteer membership that exceeds 800 persons.

This case arises from each plaintiff's decision to obtain ALS certification and to join one of the volunteer rescue squads. Some plaintiffs did not decide to join a rescue squad until after becoming City firefighters.[3] Others had volunteered for one of the rescue squads before becoming City firefighters.[4] It is undisputed, however, that each plaintiff freely decided to volunteer, and that the City in no way coerced or otherwise pressured plaintiffs to obtain advanced certification or join a rescue squad. Indeed, plaintiffs testified that their decisions to join the rescue squads were motivated by personal, civic, charitable, or humanitarian purposes.

In 1997, plaintiffs filed this lawsuit against the City, seeking overtime compensation under the FLSA for their services as rescue squad members. Despite the undisputed volunteer nature of the services when donated, plaintiffs now contend

---

1. Under the Commonwealth of Virginia's emergency medical services regulations, Basic Life Support is defined as that "level of pre-hospital and interfacility care which includes the recognition of other life threatening conditions which may result in respiratory and cardiac arrest, and the application of life support functions including cardiopulmonary resuscitation (CPR), use of adjunctive techniques and procedures." 12 Va. Regs. Reg. § 5–30–10.

2. Advanced Life Support is defined under the Commonwealth of Virginia's regulations as: a sophisticated level of prehospital and interfacility emergency care provided by the following categories of EMS personnel: EMT—Shock Trauma Technicians, EMT—Cardiac Technicians, EMT—Paramedic, equivalents approved by the Commissioner, or as stated in this chapter, which includes basic life support functions including Cardiopulmonary Resuscitation (CPR) plus cardiac monitoring, cardiac defibrillation, telemetered electrocardiography, administration of antiarrhythmic agents, intravenous therapy, administration of specific medications, drugs and solutions, use of adjunctive ventilation devices, trauma care, and other authorized techniques and procedures.
12 Va. Regs. Reg. § 5–30–10.

3. These include plaintiff Gregg Benshoff, who became a City firefighter in 1985 and first joined a rescue squad in 1995; plaintiff Jeffrey Floyd, who became a City firefighter in 1975 and a member of a rescue squad in 1994, from which he resigned in 1996; plaintiff Zeno Nichols, Jr., who joined the City fire department in 1972, but did not join a rescue squad until 1997; and plaintiff Alan Walters, who first joined a rescue squad in 1989, approximately five months after becoming a City firefighter.

4. These include plaintiff Paul Criswell, who first joined a rescue squad in 1988, two years before becoming a City firefighter; plaintiff Alan Taylor, who first joined a rescue squad in 1985, three years before becoming a City firefighter, and served until he was terminated in 1998 by his most recent squad for missing assigned shifts; and plaintiff George Marshall, who was also a member of a rescue squad before joining the City fire department in 1988.

that, since 1990, they have actually performed such services as "employees" of the City as that term is defined by and interpreted under the FLSA. We disagree.

## II.

### A.

The FLSA generally requires that all employers compensate their employees at the rate of one and one-half times their normal hourly rate for all hours worked in excess of a 40–hour week. *See* 29 U.S.C.A. § 207(a)(1) (West 1998). The Act's purpose is to protect "the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others." *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949 (1944). And because the Act is "remedial and humanitarian in purpose," *id.,* it should be broadly interpreted and applied to effectuate its goals, *see id.; see also Tony & Susan Alamo Found. v. Secretary of Labor,* 471 U.S. 290, 296, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985).

Those seeking compensation under the Act bear the initial burden of proving that an employer-employee relationship exists and that the activities in question constitute employment for purposes of the Act. *See Davis v. Food Lion,* 792 F.2d 1274, 1276 (4th Cir.1986). Once this burden is met, the employer bears the burden of proving entitlement to any exemptions or exceptions to the Act's compensation requirements. *See Johnson v. City of Columbia,* 949 F.2d 127, 129–30 (4th Cir. 1991) (en banc).

The Act, however, provides little guidance as to what constitutes an employer-employee relationship or "employment" sufficient to trigger its compensation provisions. An "employee" is defined as "any individual employed by an employer," 29 U.S.C.A. § 203(e)(1), and an "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee," *id.* at § 203(d).

To "employ" means "to suffer or permit to work." *Id.* at § 203(g).

The scope of these definitions, however, is not limitless. *See, e.g., Tony & Susan Alamo Foundation,* 471 U.S. at 295, 105 S.Ct. 1953; *Isaacson v. Penn Community Servs., Inc.,* 450 F.2d 1306, 1308 (4th Cir.1971). "The Act's purpose as to wages was to insure that every person whose employment contemplated compensation should not be compelled to sell his services for less than the prescribed minimum wage." *Walling v. Portland Terminal Co.,* 330 U.S. 148, 152, 67 S.Ct. 639, 91 L.Ed. 809 (1947). Accordingly, the definitions of "employ" and "employer" were "not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another," nor should they be interpreted so as to "sweep under the Act each person who, without promise or expectation of compensation, but solely for his personal purpose or pleasure, work[s] in activities carried on by other persons either for their pleasure or profit." *Id.; see also Tony & Susan Alamo Foundation,* 471 U.S. at 295, 105 S.Ct. 1953. Thus, for example, in determining whether an employer-employee relationship exists for purposes of the FLSA, we have looked to see whether the individual seeking compensation can be said to have "displaced a bona fide applicant who desired to sell his services at prevailing rates, or . . . to be an exploited unorganized laborer, evils which the Act was designed to prevent." *Isaacson,* 450 F.2d at 1310.

Similarly, because the Act does not define which activities constitute "employment" sufficient to trigger its provisions, "employment" is to be determined by its commonly understood meaning, which is "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tennessee Coal,* 321

U.S. at 598, 64 S.Ct. 698; *see also Roy v. County of Lexington,* 141 F.3d 533, 544 (4th Cir.1998). In making this inquiry, courts remain mindful that "[t]he employer-employee relationship does not lend itself to rigid per se definitions, but depends upon the circumstances of the whole activity." *Reich v. ConAgra, Inc.,* 987 F.2d 1357, 1361 (8th Cir.1993) (internal quotation marks omitted); *see also Roman v. Maietta Constr., Inc.,* 147 F.3d 71, 75 (1st Cir.1998).

### B.

With these principles in mind, we examine the plaintiffs' contention that, although they unquestionably "volunteered" to provide ALS services as rescue squad members, the FLSA demands that we consider them "employees" of the City when they performed the services. This result is dictated, plaintiffs assert, because the City created a Department of Emergency Medical Services ("DEMS") in 1990 to oversee and coordinate the provision of all emergency medical services within its boundaries and because, plaintiffs further assert, the services "necessarily and primarily" benefited the City. *See Tennessee Coal,* 321 U.S. at 598, 64 S.Ct. 698; *see also Falk v. Brennan,* 414 U.S. 190, 195, 94 S.Ct. 427, 38 L.Ed.2d 406 (1973) (finding employer-employee relationship based upon "substantial control of the terms and conditions of the work of the[ ] employees").

### 1.

In order to address plaintiffs' contentions in this regard, we begin with a more detailed look at the events leading up to the City's creation of DEMS, as well as the extent of DEMS' "control" over the rescue squads and their members.

As an initial matter, the provision of emergency medical services within the City is governed by the Commonwealth of Virginia, which requires all public and private entities to meet minimum requirements for BLS or ALS licensure, and which requires all individual providers to obtain certification to provide BLS or ALS care. *See* 5A Va. Code Ann. §§ 32.1–111.1 to 32.1–111.16 (Michie 1997 and Supp. 1998). At the direction of the legislature, the Virginia Department of Health has developed detailed regulations governing the provision of such services to ensure a "comprehensive, coordinated, emergency medical care system in the Commonwealth." 5A Va. Code Ann. § 32.1–111.3; *see* 12 Va. Regs. Reg. §§ 5–30–10 to –480. In addition, local governmental entities are empowered to establish their own regulations governing the operation of emergency medical services vehicles, provided such regulations are consistent with the statute and Department of Health regulations. *See* 5A Va. Code Ann. § 32.1–111.14.

It appears that from the 1940s until approximately 1975, the volunteer rescue squads, each of which had obtained the requisite state ALS license, operated independently from the City. They did, however, begin receiving advice in medical techniques and procedures from local volunteer physicians who recognized the importance of pre-hospital care. This eventually led to the development of a central coordinating and training office and a rescue squad captain advisory board in the early 1970s.

In the mid–1970s, City support for a central office was gained, and,in 1981, the City Council enacted an ordinance establishing a formal emergency medical services organization within City government. Then, in 1990, the City passed an ordinance creating DEMS, a City department charged with coordinating and supervising responses by the City fire departments and the volunteer rescue squads to emergencies occurring within the City's boundaries. Pursuant to the ordinance, DEMS consists of "a director of emergency medical services, a medical director endorsed by the Virginia Beach Medical Society, the members of the operational volunteer rescue squads serving the city[,] and such other committees, boards, organizations and personnel as may be ordered by the .

city manager, the medical director or the director...."

DEMS itself, however, employs only a handful of paid personnel. The Director of DEMS is a full-time employee, assigned responsibility for the management and control of the department. Pursuant to the terms of the ordinance, all members of DEMS and all City firefighters are subject to the supervision and control of the DEMS Director "whenever they are engaged in emergency medical and rescue services activities" within the City. The Medical Director of DEMS is employed as a part-time physician, responsible for establishing medical policy for the direction and coordination of patient care, including medical training standards, medical care procedures and protocols, medical performance standards, and general medical control. In addition to the two directors, there are a small number of paid DEMS employees who perform administrative and training-related duties. However, DEMS employs no personnel to actually perform emergency medical services as part of their duties.

As DEMS has evolved, policies and procedures governing the provision of emergency medical services within the City have been adopted. However, these policies and procedures have not been arbitrarily adopted by DEMS and imposed upon the rescue squads and their members. Rather, they were formulated and adopted by DEMS in cooperation with the Council of Virginia Beach Volunteer Rescue Squads, which serves as the advisory board to the Director pursuant to the ordinance. Broadly speaking, DEMS serves essentially two functions: certification of emergency medical technicians who seek to practice within the City, which includes ensuring that they maintain their certification by meeting the required training and service requirements, and assistance in the coordination of public and private emergency response services within the City. In addition, the City provides some financial assistance to the rescue squads, often in addition to Commonwealth and privately-raised funds, and provides the volunteers with workers' compensation and death benefits in the event they are injured or killed in the course of service to the squads.

2.

With these additional facts in mind, we turn to the issue of whether the City's involvement in the provision of emergency medical services by the rescue squads is sufficient to render plaintiffs' volunteer services "employment" which is "controlled or required" by the City for purposes of the FLSA. We recognize, as did the district court, that DEMS' supervision of emergency rescue services within the City's borders is not insubstantial. However, considering the "circumstances of the whole activity," *ConAgra*, 987 F.2d at 1361, we are unpersuaded that the creation of DEMS in 1990 resulted in either the evisceration of the independent nature of the rescue squads, some of which have existed since the 1940s, or in a *de facto* employer-employee relationship between the City and those individuals who chose to volunteer with rescue squads.

Initially, we note that plaintiffs do not contend that the City or DEMS "required" or otherwise exerted any "control" to bring about their volunteer service in the first instance. *See Tennessee Coal*, 321 U.S. at 598, 64 S.Ct. 698. Nor could they. Each plaintiff freely and independently sought ALS certification from DEMS and joined a rescue squad in order to provide advanced emergency medical services. Plaintiffs have explicitly disavowed that the City coerced them to volunteer or that the City required them to seek certification beyond that needed to provide BLS in connection with their duties as firefighters. Indeed, three plaintiffs resigned from their respective rescue squads, without effect upon their employment with the City, because they felt that the squad requirements were too burdensome. Furthermore, plaintiffs testified that their decisions to volunteer

resulted from humanitarian or other personal reasons.

Of course, the charitable nature of plaintiffs' service, at least when initially offered, and the City's lack of coercion are only part of the inquiry. We also examine the nature of the control and supervision by DEMS over the rescue squads and the rescue squad members, but find its limited control to be equally insufficient to render the rescue squad members "employees" of the City under the FLSA when performing their rescue squad services.

First, while we recognize that the rescue squads and their members are required to comply with minimum requirements imposed by DEMS, we find this fact to be of little, if any, relevance to a determination of whether the members are "controlled" by DEMS in the same manner that an employer "controls" an employee. Rescue squads and rescue squad members are also required to comply, no more or less, with the minimum requirements imposed by the Commonwealth. The fact that they are regulated and licensed by governmental entities, however, does not change the fact that the rescue squads are private organizations, governed by their own by-laws and policies. They possess independent licenses from the Commonwealth to provide emergency medical services, and, with the exception of the first response services provided by firefighters pursuant to the City's non-transport BLS license, all emergency medical services within the City must be performed pursuant to the individual's affiliation with an ALS-licensed rescue squad.[5]

Similarly, although DEMS oversees the certification of individual providers of emergency medical services and may revoke certifications, it is the rescue squads that hold the ultimate authority to accept or reject candidates for membership even if otherwise approved for certification by DEMS. For applicants seeking certification, DEMS conducts background investigations, reviews their education and skills, and identifies any additional training that is required. DEMS then forwards approved applications directly to the rescue squads, which may accept or reject individuals for membership. For each accepted member, DEMS thereafter maintains a personnel file and a training file, which contain information relevant to the individual's level of certification and associated qualifications. In addition, DEMS monitors certified members to ensure that they meet the minimum duty requirements imposed by the Commonwealth and DEMS to maintain their certification—which is usually four 12–hour shifts per month. Certified members of DEMS may be placed on administrative leave, reprimanded, suspended, demoted, or dismissed as members of DEMS, or decertified, for "unsatisfactory work performance or misconduct," subject to a grievance policy established solely for such members.

However, because DEMS certification is always contingent upon membership in a rescue squad under whose license the member can actually practice, the rescue squad retains authority to prohibit any individual from performing emergency medical services within the City even if he or she is otherwise qualified for DEMS certification. In addition, the rescue squads impose minimum duty requirements which must be met to maintain membership in the squad, which may well

---

**5.** Plaintiffs have placed reliance upon the fact that firefighters who have obtained ALS certification from DEMS may, but are not required to, provide ALS care when acting as a first responder on a fire truck. In addition, firefighters who are ALS certified have been allowed to accompany a patient in the rescue squad ambulance during transport in some circumstances. All such care, however, is and must be provided under the auspices of the rescue squad's ALS license. We find that this activity, which is never required but obviously permitted in the interests of citizen health and safety, is an insufficient basis upon which to conclude that the firefighters are always acting as City employees when they provide emergency medical care.

exceed those imposed by DEMS.[6] Moreover, all squad members are disciplined directly by the squad pursuant to its by-laws and rules. Such disciplinary action may include dismissal from the squad, regardless of whether DEMS has revoked the member's certification, and will result in automatic decertification by DEMS.

Thus, it can hardly be said that the DEMS certification requirements amount to control sufficient to establish an employer-employee relationship with those it certifies. Indeed, the rescue squad members are no more employees of DEMS for this reason than they, or other state-licensed personnel, are employees of the Commonwealth.

Second, we are unpersuaded that DEMS' involvement in the day-to-day provision of emergency medical services by the rescue squads and their members is sufficient to render the members "employees" of the City under the FLSA. In addition to maintaining a centralized emergency communications center, DEMS has instituted procedures which divide the City into "brigades" and "zones" to geographically coordinate available rescue resources, both public and private, to ensure adequate emergency responses. The DEMS Director selects Brigade Commanders, Squad Commanders, and Assistant Squad Commanders to operate as the liaisons between the individual rescue squads and DEMS and to establish a hierarchy for control during emergency responses to minimize confusion.

DEMS also works with the rescue squads to provide centralized scheduling of those squad members who wish to perform emergency medical services from "zone cars" (non-transport emergency vehicles

assigned to ALS certified members for use in responding to ALS calls within a particular zone), and squad members who wish to function as an "EMS–5" (the "on-duty" emergency medical services coordinator or supervisor during a particular shift). The volunteers submit their names, the number of shifts they desire to work, and the dates they are available and willing to serve. DEMS, in turn, compiles a duty roster and distributes it to the volunteers. All other rescue squad scheduling, including ambulance duty, is handled exclusively by the individual rescue squads.[7]

Upon careful consideration of all the circumstances surrounding the day-to-day provision of emergency medical services within the City, as well as the nature of the City's involvement in the services being performed by the rescue squads and the volunteers, we are unpersuaded that DEMS' role in coordinating services or in compiling the zone car and EMS–5 schedules is sufficient to establish an employer-employee relationship under the FLSA. In actuality, DEMS' "control" of the rescue squad volunteers is quite limited. Although DEMS' structure ensures that there is a hierarchy of control in every medical emergency, the personnel selected by the DEMS Director to coordinate these services on a daily basis are not City or DEMS employees. Rather, the Brigade, Squad, and Assistant Squad Commanders are selected by the Director from volunteer rescue squad members who have already been elected or appointed to management positions within their respective squads. Similarly, DEMS neither demands that rescue squad members accept zone-car, EMS–5, or any other duties, nor arbitrarily assigns rescue squad volunteers

---

6. Some rescue squads, in cooperation with DEMS, allow certified firefighters to possess a more limited associate membership with the squad, which carries a reduced requirement of two 12–hour shifts per month.

7. Although not applicable to plaintiffs' service, DEMS also coordinates with rescue squads that own squad trucks to schedule city-wide coverage. Squad trucks respond to

special emergencies such as building collapses, multiple vehicle accidents and other incidents where specialized equipment is needed. It appears that the seven rescue squads that own these trucks rotate "squad truck" duty for the entire City. DEMS also schedules special emergency rescue services, such as the boat rescue and diver teams.

to the duties. Rather, DEMS compiles a schedule from specific requests made by those rescue squad members who desire to serve in the position of an EMS–5 supervisor or to drive what appears to be the preferred zone cars—as opposed to meeting their service requirements through other duties. In addition, DEMS suffers from a significant lack of control over the number of hours a member may choose to serve, as it possesses no control over the minimum service and training requirements imposed· by the individual rescue squads, no control over the scheduling of the rescue squad ambulances, and no control over the members' attendance at mandatory rescue squad meetings or fundraising events which the squads may require as an internal condition of continued membership in the squad.

██ Finally, the City has provided some financial assistance and benefits to the rescue squads and their members. In recent years, for example, the City has purchased and maintained zone cars, for which it provides liability insurance, and has provided loans and grants, in conjunction with Commonwealth funds, to allow the less-funded rescue squads to purchase ambulances and squad trucks. The City does not, however, employ any personnel whose job duties include the provision of pre-hospital emergency medical care, nor does it own any ambulances or other vehicles capable of transporting those in need of such services. Other significant benefits provided by the City include death benefits in the event a rescue squad member dies in the line of duty, as well as state workers' compensation benefits in the event a squad member is injured. However, we fail to see how the City's mere recognition of the value of its volunteer rescue squads, through its provision of some financial assistance, or its volunteers, through its assistance to them and their families in the event they are injured or killed providing

emergency services to the citizens, is a sufficient basis upon which to consider them "employees" under the Act entitled to overtime compensation for work that they clearly intended to perform voluntarily for the rescue squads.[8]

3.

██ Additionally, we reject plaintiffs' assertion that their activities as rescue squad members "necessarily and primarily benefit" the City simply because these activities generally benefit the City and its citizens. Of course the services benefit the citizens of Virginia Beach and the City government. Indeed, it is difficult to envision a truly charitable or humanitarian service provided to City residents which would not benefit the residents and their government. The issue, however, is whether the City "necessarily and primarily" benefits from the services, keeping in mind the purposes of the Act. We conclude that it does not.

The rescue squads have been providing emergency medical services within the City for over 50 years. Since their inception, their services have depended upon the volunteer spirit of their members and fundraising assistance from the members and the community. Neither the creation of DEMS, nor the limited financial assistance that the City now provides, has significantly changed this fact. Accordingly, the entity that "necessarily and primarily benefits" from a particular volunteer's willingness to contribute his or her time and talents remains the rescue squad itself.

4.

██ Accordingly, we conclude that plaintiffs were not acting as "employees" of the City for purposes of the FLSA when performing the emergency medical services at issue in this lawsuit. The City of Virginia Beach owns no ambulances and employs no emergency medical technicians whose primary job duty is to provide such

---

8. We note, in this regard, that the Virginia Workers' Compensation Act specifically allows local governing bodies to extend workers' compensation benefits to volunteer rescue squad members. *See* 9A Va. Code Ann. § 65.2–101(1)(*l*) (Supp. 1998).

services. The citizens of Virginia Beach, through their city government, have chosen instead to rely upon private, non-profit entities for emergency medical care. As the expected level of sophisticated care has risen, they have also agreed to provide these long-standing entities and their members with limited financial and administrative support. However, this support does not, in our view, change the nature of the services being provided. Plaintiffs volunteered their services to the rescue squads for personal and charitable reasons, "without promise or expectation of compensation." *Walling*, 330 U.S. at 152, 67 S.Ct. 639. They have in no way been "compelled to sell [their] services for less than the prescribed minimum wage," *id.*, nor have they "displaced a bona fide applicant who desired to sell his services at prevailing rates," *Isaacson*, 450 F.2d at 1310.

In short, plaintiffs claim entitlement to compensation from the City for services volunteered to the rescue squads which the City did not request or demand, and for which the plaintiffs did not expect to be paid. After making the independent decision to volunteer their services, plaintiffs have apparently changed their minds, believing the City should compensate them for these services. It is clear, however, that they have no remedy in the FLSA for this change of heart. Rather, they have a choice—the same choice available to the hundreds of other rescue squad members who have donated their time and service for personal and charitable reasons; they may resign from their rescue squads. Thus, we agree with the district court— "[i]f they no longer wish to be volunteers, the plaintiffs need only resign from the rescue squads and limit their activities to their regular shifts as firefighters, which in no way hinders them." *Benshoff*, 9 F.Supp.2d at 624.

### III.

### A.

▇▇ Plaintiffs next contend that we need not examine whether an employer-employee relationship exists between the City and the rescue squad members under the foregoing analysis because § 203(e)(4)(A) of the FLSA requires that firefighter volunteers, unlike the other 700+ volunteer rescue squad members, be treated as "employees" of the City when performing emergency medical services. This arbitrary distinction between the plaintiffs and the other rescue squad volunteers, they argue, is mandated by the simple fact that they are employed by the City as firefighters and are required, in the latter capacity, to perform some basic emergency medical care.

Section 203(e)(4)(A) provides that:

The term "employee" does not include any individual who volunteers to perform services for a public agency which is a State, a political subdivision of a State, or an interstate governmental agency, if—

(i) the individual receives no compensation or is paid expenses, reasonable benefits, or a nominal fee to perform the services for which the individual volunteered; and

(ii) such services are not the same type of services which the individual is employed to perform for such public agency.

29 U.S.C.A. § 203(e)(4)(A). The Act defines "[p]ublic agency" as "the Government of the United States; the government of a State or political subdivision thereof; any agency of the United States (including the United States Postal Service and Postal Rate Commission), a State, or a political subdivision of a State; or any interstate governmental agency." 29 U.S.C.A. § 203(x).

Relying primarily upon *NLRB v. Natural Gas Util. Dist. of Hawkins County, Tenn.*, 402 U.S. 600, 604–05, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971), the district court concluded that the volunteer rescue squads

are not "public agencies" under the FLSA because they are neither agencies, departments, or divisions of the City, nor are they administered by individuals answerable to the City or to the general electorate. Accordingly, the district court held that § 203(e)(4)(A) did not apply to plaintiffs' FLSA action because plaintiffs volunteered to perform emergency medical care services for the private rescue squads and not for their public agency employer, the City.

Section 203(e)(4)(A) was enacted as an amendment to the FLSA in 1985 in order to exempt from the definition of "employee," and consequently from the FLSA pay requirements, those individuals who volunteer services to governmental entities. *See* 29 C.F.R. § 553.100(1998). According to the Department of Labor, in enacting the FLSA, "Congress did not intend to discourage or impede volunteer activities undertaken for civic, charitable, or humanitarian purposes, but expressed its wish to prevent any manipulation or abuse of minimum wage or overtime requirements through coercion or undue pressure upon individuals to 'volunteer' their services." 29 C.F.R. § 553.101(b). Accordingly, "[i]ndividuals shall be considered volunteers only where their services are offered freely and without coercion, direct or implied, from an employer." 29 C.F.R. § 553.101(c).

In subsection (ii) of § 203(e)(4)(A), however, Congress imposed, in effect, a limited public agency employee exception to this volunteer exemption by providing that "[t]he term 'employee' [for purposes of the FLSA] does not include any individual who volunteers to perform services *for a public agency* ... [if] such services are not the same type of services which the individual is employed to perform *for such public agency.*" *Id.* (emphasis added). The Department of Labor's regulation interpret-

ing subsection (e)(4)(A)(ii) of § 203 also recognizes the limited application of this exception to the volunteer exemption— providing that "[a]n individual shall not be considered a volunteer if the individual is otherwise employed by the *same public agency* to perform the *same type of services* as those for which the individual proposes to volunteer." 29 C.F.R. § 553.101(d) (emphasis added).

On appeal, plaintiffs do not seriously argue that the rescue squads are public agencies. Rather, they contend that the status of the rescue squads as public or private entities is not material to the § 203(e)(4)(A) inquiry because the only relevant inquiry is whether the plaintiffs' have rendered the volunteer services "for the benefit of the City."[9] Again, we disagree.

Essentially, plaintiffs want us to ignore the plain language of this limited exception to the volunteer exclusion, contending that we should either consider that they volunteered the services "for the City," or expand the exception such that services being performed at work and the "same" services being volunteered need *not* be for the "same public agency" to exempt them from the volunteer provisions so long as they "benefit" the City. We find no factual support for the former for reasons already discussed. And we find no legal support for the latter, which really appears to be a claim that the rescue squad services need not even be volunteered "for a public agency" to fall within the exception. Rather, plaintiffs seek a determination that the exception operates as an absolute prohibition against a public agency ever allowing its employees to volunteer similar services if the services will benefit the public agency.

Such an interpretation of § 203(e)(4)(A) would render irrelevant our consideration

---

9. The Department of Labor has determined that "[t]he phrase 'same type of services' means similar or identical services." 29 C.F.R. § 553.103(a). Because we conclude that plaintiffs did not volunteer their rescue squad services for a public agency, we need not determine whether plaintiffs' ALS services for the rescue squads are of the "same type" as the BLS services they are required to provide as part of their firefighter duties.

of the fact that plaintiffs' services were volunteered to separately incorporated, non-profit entities, that the City exerted no pressure upon them to volunteer the services, and that, in some cases, the plaintiffs decided to volunteer for the rescue squads before they even became employees of the public agency. However, neither the plain language of the volunteer provisions of § 203(e)(4)(A), nor the purposes underlying it, warrant such an expansive reading. The section plainly eliminates any impediment to individuals who wish to volunteer their time and talents to public agencies for civic, charitable, and humanitarian purposes. There is no indication that Congress intended to erect an absolute barrier against talented public agency employees volunteering their time to *private* entities simply because their services might ultimately be of benefit to the public agency or the citizens they serve—particularly in circumstances where the volunteer nature of the services and the absence of any coercion by the public agency is unquestionable.

Yet under plaintiffs' proffered reading of the section, the City, which has imposed minimal educational and competency requirements as well as reasonable measures of control over emergency medical services, would be required to prohibit not only plaintiffs, but more than twenty additional firefighters from serving as volunteer rescue squad workers, or to write them a blank check for all hours they chose to volunteer in service to the rescue squads. Such an illogical result is simply not called for by the limited nature of the

public agency employee exception in § 203(e)(4)(A).[10]

### B.

Finally, we turn briefly to the contentions of the Secretary of Labor, who, at our request, has filed an *amicus curiae* brief. The Secretary asks that we find plaintiffs' volunteer emergency medical services to have been, "as a practical matter," work "effectively performed 'for' the City" and, thus, compensable under the FLSA. Like plaintiffs, the Secretary seeks to expand § 203(e)(4)(A)'s language, contending that this interpretation is warranted because the City controlled the scheduling and delivery of all emergency services and derived a substantial benefit from such services. We disagree.

First, the circumstances surrounding the activity at issue, including who exercises control over it and who benefits from it, *are* relevant considerations for determining whether an employer-employee relationship exists under the Act and whether a particular activity constitutes employment under the Act. *See Tennessee*, 321 U.S. at 598, 64 S.Ct. 698; *Roy*, 141 F.3d at 544; *ConAgra*, 987 F.2d at 1361–62. However, we see no reason to believe that by virtue of § 203(e)(4)(A) Congress intended to insert the issues of control and benefit, to the exclusion of all other relevant considerations, into the determination of whether a public agency employee is volunteering services "for a public agency," in the first instance, or to thereby eliminate for public employees the requirement that one seeking compensa-

10. At oral argument, plaintiffs sought to limit their FLSA claims to the hours they spent on zone car duty as ALS providers—the schedule for which is compiled by DEMS. We decline to accept this eleventh-hour limitation, no doubt advanced in an attempt to mitigate our concern for the lack of control DEMS has over its potential overtime liability. Nor would our acceptance of it serve the plaintiffs in their claims. The record simply does not support the representation that the plaintiffs always served as ALS zone car drivers. On the contrary, it appears that several of the plaintiffs also worked from ambulances, which are scheduled by the individual rescue squads, and that one plaintiff did not possess the qualifications necessary to man a zone car. Furthermore, assignments to the preferred zone cars are at the behest of the individual rescue squad members, and all such duties are still performed pursuant to the rescue squad's ALS license. Accordingly, we hardly see this single scheduling service by DEMS as being a sufficient basis to create an employer-employee relationship between the members and the City, which would not exist otherwise, or to conclude that the services are being performed "for" the City.

tion under the FLSA must first prove that an employment relationship exists with regard to a particular activity at issue. *See Anderson*, 328 U.S. at 686–87, 66 S.Ct. 1187; *Davis*, 792 F.2d at 1276.[11] On the contrary, we believe that traditional judicial inquiry into whether a particular activity constitutes employment for purposes of the Act would be more than sufficient to ferret out any cases where, unlike the one before us, there is a "sham" private volunteer corporation placed between an employee and his employer to avoid the compensation provisions of the Act.

Second, although not determinative of whether § 203(e)(4)(A) mandates that the firefighters be treated as employees of the City when performing rescue squad services, we believe that the Secretary attributes a degree of control and benefit to the City which, for the reasons previously discussed, is not borne out by the undisputed facts in the record and is not sufficient to render the rescue squad services "employment" by the City for purposes of the FLSA.

## IV.

In summary, we conclude that plaintiffs were not employees of the City of Virginia Beach for purposes of the FLSA when they performed volunteer emergency services for private, non-profit rescue squads. Accordingly, we affirm the district court's decision to deny plaintiffs' motion for summary judgment and to grant summary judgment in favor of the City of Virginia Beach.

*AFFIRMED*

---

11. Plaintiffs and the Secretary have brought to our attention several opinion letters of the Wage and Hour Division of the Department of Labor which, while not addressing identical facts, lend some support to such an expansive reading of the section. We recognize that opinion letters of the Department of Labor are generally accorded some deference. *See Batterton v. Francis*, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). However, we are constrained to conclude that in the context of this case, they are contrary to the plain language of § 203(e)(4)(A) and inject considerations which are neither called for by the section nor consistent with its purposes.