PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TAMMY STEELMAN,
         *Plaintiff-Appellant,*

v.

MICHELLE HIRSCH, d/b/a Hair of the Dog,

         *Defendant-Appellee.*

No. 06-1007

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
Lacy H. Thornburg, District Judge.
(CA-04-204-1)

Argued: October 27, 2006

Decided: January 10, 2007

Before WILKINSON, GREGORY, and DUNCAN, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Duncan joined. Judge Gregory wrote an opinion concurring in the judgment.

---

## COUNSEL

**ARGUED:** Linda Vespereny, LAW OFFICES OF GLEN C. SHULTS, Asheville, North Carolina, for Appellant. Earl Thomison Holman, ADAMS, HENDON, CARSON, CROW & SAENGER, P.A., Asheville, North Carolina, for Appellee. **ON BRIEF:** Glen Coile Shults, Jr., Asheville, North Carolina, for Appellant.

**OPINION**

WILKINSON, Circuit Judge:

The parties in this case were romantic partners who exchanged vows, lived together, and worked side by side in a dog-grooming business known as "Hair of the Dog" in Asheville, North Carolina. The defendant, Michelle Hirsch, and the plaintiff, Tammy Steelman, supported themselves from the business' proceeds. They anticipated spending their lives together, but when the romantic relationship ended, the professional relationship collapsed as well. In this lawsuit, Steelman seeks an ownership share in Hair of the Dog and compensation for work that she alleges was performed in reliance on Hirsch's promises of additional compensation, in addition to or in lieu of damages under the Fair Labor Standards Act (FLSA) and the North Carolina Wage and Hour Act.

The district court granted summary judgment to the defendant on the sole federal cause of action — the FLSA claim — and dismissed the state law claims without prejudice after it declined to exercise supplemental jurisdiction. We affirm, because the FLSA covers only "employees" and cannot be stretched to reach the particular arrangement at issue here. Although the plaintiff may well have a basis for recovery in state law, the FLSA cannot be transformed into a blunt instrument to resolve all manner of financial disputes.

I.

Plaintiff Tammy Steelman and defendant Michelle Hirsch met and became romantically involved in the fall of 1999. The relationship quickly became a serious one and Steelman moved in with Hirsch in December of that year. The couple initially agreed to split rent, utilities, and food costs. The next month, however, the couple revised their arrangement when Steelman left her job at a local residential cleaning company to work at Hair of the Dog, a dog-grooming business that Hirsch had founded as a sole proprietorship in June of 1999.

Steelman saw the job as a way to build on a committed domestic partnership. "We discussed the fact that we planned on being

together," Steelman said in her deposition. "My working for her was us working for our future." Steelman also believed she would be better off financially, because her new position "wasn't a job. It was [Hirsch] and I committed to a business, and we did everything we could to make it succeed." She added, "There was never any question that we weren't going to be together forever and that we weren't going to work side by side in that business." At the time Steelman started work, she and Hirsch were the only people working at Hair of the Dog.

Steelman worked full-time at Hair of the Dog for the next four years, performing tasks such as bathing and grooming dogs and ordering, receiving, and selling merchandise. After Hirsch instructed her in dog-grooming technique, Steelman said, "[a]nything she did, I did, and anything I did, she did. We worked side-by-side." Steelman said that when the company hired additional workers, she acted as supervisor and had the authority to hire and fire.

The couple did not sign a compensation agreement, but according to Steelman, they had conversations in which Hirsch communicated that "[w]hat was mine was hers and what was hers was mine." They also agreed that instead of splitting the cost of their lives together as initially planned, they would pay their expenses from Hair of the Dog's revenue. The couple took the company's successes and failures into account when they made spending decisions, but throughout their relationship, they used business proceeds to pay their rent and their bills for electricity, water, cable service, and Internet access. The funds also covered Steelman's cell phone, auto insurance, and doctor's visits, as well as the cost of food, gas, and cigarettes. In addition, the couple took trips to places including Charleston, Las Vegas, New Orleans, Phoenix, California, Florida, and Georgia using company funds. When Steelman needed a car in 2002, she purchased a Jeep from Hirsch's father for $1.

Steelman said she was uncomfortable with the amount of the company's proceeds spent to maintain the couple's lifestyle. She said Hirsch "spent all the money on extravagant gifts," and that the couple was "continuously eating out." As she put it in her deposition, "We were blowing every penny we made as fast as we could make it. Had

to have the best of everything. I didn't believe in that. I believed we should be saving money and saving for our future."

Both Steelman and Hirsch were issued American Express cards whose bills were paid from Hair of the Dog proceeds, and both used the cards for personal expenses like gas and cigarettes. The couple also had a joint checking account and ATM cards. Before making large expenditures, however, Steelman would generally have to ask Hirsch to transfer money from Hair of the Dog to the couple's personal account, because the personal account usually contained little cash and Steelman herself could not make withdrawals from the business account. Steelman kept a separate savings account of her own, to which she would make occasional deposits, but not withdrawals for day-to-day expenses. She received health insurance through Hair of the Dog for most of her time at the company, and received sporadic paychecks to substantiate the company's claim that she was on its payroll for insurance eligibility purposes.

Hirsch said in an affidavit that during the couple's relationship, the parties spent "substantially more" than the business earned. Hirsch borrowed from her parents to pay costs such as start-up expenses and taxes, and after this lawsuit was filed Hirsch said in an affidavit that she owed more than $100,000 to her parents for these debts, most of which she said were incurred while Steelman worked at the company.

The parties bitterly dispute whether their private agreements included guarantees of further compensation for Steelman. Steelman alleges that on several occasions, beginning in early 2000, the couple agreed that she would have a 26 percent stake in Hair of the Dog. Hirsch said that she discussed making Steelman a partner in the business, but had serious reservations and never promised her a stake. In denying that she treated Steelman as a partner in the business, Hirsch said that she considered Steelman an employee and operated the business as a sole proprietorship.

Steelman said that Hirsch promised other compensation as well. She said Hirsch agreed to give her money to deposit in a savings account, promised that if she left the business she would be taken care of financially, and offered severance payments, either in lieu of or in addition to the ownership stake. She said that when Hair of the Dog

stopped issuing sporadic salary checks, Hirsch told her the business would institute "profit sharing." Finally, Steelman said the couple discussed paying her commissions, but that while she received one or two such checks, they did not become commonplace. Steelman said that she tried to get promises of an ownership stake and of severance payments reduced to writing between 2000 and 2003, but that these efforts were unsuccessful.

Although Steelman said that the parties at one point exchanged vows and considered themselves married, they drifted apart. They went into couples counseling, and considered living together but not working together and working together but not living together. During her last six months at the business, Steelman said that Hirsch began to accuse her of taking more from the business than she was giving.

Their conflict came to a head in January of 2004. Hirsch asked Steelman to return her American Express card. Steelman said she did not know what prompted the action, but acknowledged that Hirsch's mother had been saying month after month that the couple was spending too much money. Steelman quit and moved out of the home the couple shared. She and Hirsch agreed to continue couples counseling, Steelman said, because "we still loved each other and were wanting to try to work things out" and "being together 24/7 was the problem."

Steelman said she asked for severance that month, but that Hirsch told her she was not entitled to severance because she quit without notice. The couple nevertheless remained friendly until late February or early March, when Hirsch became romantically involved with someone else. Steelman said she was "devastated," and felt unwelcome for the first time in the home that the couple had shared. She started a competing dog-grooming business, and filed this lawsuit.

The district court granted summary judgment to the defendant on the FLSA claims. The court wrote that the plaintiff could only recover under the FLSA if she had been an employee. It held that the plaintiff's testimony undercut any claim under the FLSA, because the plaintiff claimed to be a partner in Hair of the Dog and partnership would be inconsistent with employee status. The court declined to exercise supplemental jurisdiction over the remaining claims, which were all based in state law. It therefore dismissed without prejudice

the claim under the North Carolina Wage and Hour Act, as well as the claims for fraud and breach of contract or, in the alternative, recovery quantum meruit or unjust enrichment. Plaintiff Steelman now appeals.

We review the grant of summary judgment de novo, taking the facts in the light most favorable to the plaintiff, and drawing all permissible inferences in the light most favorable to her. *See, e.g.*, *Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 449 (4th Cir. 2004); *A Fisherman's Best, Inc. v. Recreational Fishing Alliance*, 310 F.3d 183, 190 (4th Cir. 2002).

## II.

We must determine here whether federal law prohibited the long-term couple in this case from arranging their finances as they did, and permits the plaintiff to avoid or supplement the personal and professional bargain she made with the defendant on the grounds that the FLSA required a different arrangement. The FLSA imposes minimum wage, overtime, and record-keeping requirements, but the requirements apply only to "employees." *See* 29 U.S.C. § 206(a) (2000) (minimum wage); *id.* § 207 (overtime); *id.* § 211(c) (record-keeping); *see also Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 (1985).

The plaintiff claimed a partnership stake in Hair of the Dog and does not dispute that such an interest would preclude her being an "employee" under the FLSA, but she notes that her FLSA count was one of several claims made in the alternative. While some evidence in the record supported her claim to an ownership stake, a court might nevertheless find that she was not a part-owner. If a court so found, the plaintiff argues, she should be permitted to recover back wages as an employee under the FLSA.

We agree that a party may make claims of ownership and employee status in the alternative. But federal law does not divide the world exclusively into owners and employees, and we reject the plaintiff's contentions because the relationship that she describes does not make her an employee regardless of her ownership status under state law.

## A.

A plaintiff bears the burden of establishing that she is an employee under the FLSA. *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999). The Act itself provides little guidance on the term's meaning. It defines an employee as "any individual employed by an employer," 29 U.S.C. § 203(e)(1) (2000), subject to enumerated exceptions, but this is "completely circular and explains nothing," *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992) (discussing same language in 29 U.S.C. § 1002(6)). The FLSA does not add much when it defines "employ" to include "to suffer or permit to work." 29 U.S.C. § 203(g) (2000). Consequently, "there is in the Fair Labor Standards Act no definition that solves problems as to the limits of the employer-employee relationship under the Act." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947).

The case law provides more direction. The Supreme Court has said that the term "employee" is to be broadly construed, but "it does have its limits," *Tony & Susan Alamo Found.*, 471 U.S at 295, and those limits must be defined in accordance with "economic reality," *id.* at 301 (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961) (internal quotations omitted)). The cases make clear that the "economic reality" standard calls for pragmatic construction of a concept — employment — that may have seemed at once too commonplace and too nuanced to define. Thus, courts have been exhorted to examine "the circumstances of the whole activity," rather than "isolated factors," *Rutherford*, 331 U.S. at 730, or "technical concepts," *Goldberg*, 366 U.S. at 33 (internal quotations omitted), and they have noted that in the absence of a statutory definition, it is permissible to draw upon "common linguistic intuitions," *Vanskike v. Peters*, 974 F.2d 806, 807 (7th Cir. 1992). In short, "[W]e cannot assume that Congress here was referring to work or employment other than as those words are commonly used" when it enacted the language of the FLSA. *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944).

Prior decisions make use of this contextual, common-sense approach. The Supreme Court has applied the FLSA without regard to deviations from traditional employment paradigms that are largely technical. *See, e.g.*, *Goldberg*, 366 U.S. at 32-33 (holding "formal dif-

ferences" between cooperative members and traditional employees to be irrelevant); *Tony & Susan Alamo Found.*, 471 U.S. at 301 (holding workers who received in-kind benefits to be employees in part because benefits were "wages in another form"); *United States v. Rosenwasser*, 323 U.S. 360, 361-64 (1945) (holding workers to be covered even if their employer chose to pay them by piece-rate rather than hourly wage).

However, when relationships have deviated from the traditional understanding of employment in fundamental ways, the Supreme Court has refused to shoehorn them into the Act. For example, the Court has written that the FLSA would not apply to volunteers who "without promise or expectation of compensation, but solely for [their] personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947). And it has written that the FLSA does not cover independent contractors who "without any express or implied compensation agreement, might work for their own advantage on the premises of another."[1] *Id.* We have joined other circuits in using this approach to conclude that prisoners in an inmate labor program should not be treated as employees under the FLSA, because their work "differs substantially from the traditional employment paradigm covered by the Act" and is not the "arms' length" bar-

---

[1]The plaintiff makes reference to the independent-contractor cases when she states the test for employee status is the degree to which the worker depends upon a defendant — a primary consideration in the independent-contractor context. *See Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1538 (7th Cir. 1987). The plaintiff is undisputedly not an independent contractor, however, and tests designed to ferret out such relationships have little relevance. *Wheeler v. Hurdman*, 825 F.2d 257, 272 (10th Cir. 1987) (describing independent-contractor test as "useless for drawing lines between people who are part of the same enterprise" and declining to apply its factors to determine whether partners were "employees" under FLSA); *Serapion v. Martinez*, 119 F.3d 982, 986 (1st Cir. 1997) ("We do not, however, hitch our wagon to cases deciding whether a particular individual is an employee as opposed to an independent contractor. That distinction is between those who are part of an employer's business and those who are running their own businesses, and the factors central to that inquiry are inapposite here.").

gain for labor "that occurs in a true employer-employee relationship." *Harker v. State Use Indus.*, 990 F.2d 131, 133 (4th Cir. 1993).

The plaintiff does not quarrel with the Tenth Circuit's application of these principles to hold that general partners in a business are not covered by the FLSA. *See Wheeler v. Hurdman*, 825 F.2d 257, 277 (10th Cir. 1987). The Tenth Circuit wrote that "[t]he word 'employee,' however broadly defined, is still 'employee,' and circumscribed by meanings reasonably related to that word." *Id.* at 276. It concluded, pertinently for this case, that attributes of partnership such as exposure to risk, managerial control, and the ability to share in profits, *id.* at 274, "introduce complexities and economic realities which are not consonant with employee status," *id.* at 275; *see also Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 444, 449-51 (2003) (declining to hold that shareholders and directors of professional corporation must be employees under Americans with Disabilities Act definition of "individual employed by an employer").

### B.

Taking the evidence in this case in the light most favorable to her, the plaintiff cannot be adjudged an "employee" for purposes of the FLSA under these precedents, or under any analysis based in "economic reality." The intended lifetime partnership she described was not "the bargained-for exchange of labor for mutual economic gain that occurs in a true employer-employee relationship." *Harker*, 990 F.2d at 133 (internal quotations omitted). According to the plaintiff, the couple saw their work together as a way to improve an economic future that they intended to share in perpetuity, rather than as a transfer of one individual's assets to another in exchange for labor. The plaintiff did not obtain a bargained-for portion of her supposed employer's assets — she took from those assets for her own purposes with a discretion that is fundamentally alien to employer-employee relationships.

To be sure, the plaintiff would consult with the defendant prior to significant expenditures, and she did not withdraw funds directly from the company's coffers. But her financial control was substantial even if it was indirect: She funded her day-to-day expenditures using an American Express card whose bills were paid by the business and by

withdrawals from a joint checking account containing funds transferred from Hair of the Dog. Far from alleging that she had the benefit of only a meager share of company resources as a result of her indirect control, the plaintiff said she would have preferred that the couple spent less of the business' money, took fewer trips, and ate out at restaurants less regularly.

Such extensive access to company funds is not the kind of privilege that employees enjoy with respect to their employers' revenue. Indeed, the plaintiff's ability to draw compensation from the company exceeded the financial control typical in the partnerships that the plaintiff does not dispute fall outside the FLSA. When the plaintiff lived comfortably and exclusively off the proceeds of the business and exerted authority in disposing of its funds, we find it hard to see the bargain exchanging labor for compensation that marks employment arrangements.

The relationship between Hirsch and Steelman was significantly entrepreneurial. Plaintiff and defendant shared the risks and rewards of their joint venture in a fashion more characteristic of a partnership than an employer-employee relationship. They adjusted their expenditures to the company's successes and setbacks. Each would on occasion call the defendant's mother, who handled the company's accounting, to ask whether the couple could afford a desired purchase, given the company's performance. "I remember one time us asking [about] something and she said, You just can't afford it," the plaintiff said. "And I recall one time asking to go on a vacation and she said, You all can afford that." We do not hold that compensation linked to company performance is inherently incompatible with an employee relationship, but we agree with the Tenth Circuit that "real opportunity to share in the profits of the business" is a consideration that weighs against such status. *Wheeler*, 825 F.2d at 275.

The rest of the plaintiff's account is consistent with this conclusion. The plaintiff testified that she performed the same duties as the defendant, from dog grooming to customer relations, and that she had supervisory authority, including hiring and firing, over other employees as the business grew and took on new personnel. In addition, while we do not determine the effect under North Carolina law of the defendant's alleged promises to the plaintiff of a 26 percent owner-

ship stake in the business, the promises do not themselves bespeak a traditional employment relationship, to say the least.

In sum, the parties' financial and work arrangements cannot be categorized as mere "formal differences" from a classic framework of employment, *Goldberg*, 366 U.S. at 32, but instead render the parties' relationship as distinct from an employer-employee relationship as the independent contractor, volunteer, and trainee relationships that are already regarded as outside the FLSA. *See Walling*, 330 U.S. at 152-53. We find the parties' business venture falls outside the FLSA because it "differs substantially from the traditional employment paradigm" and goes beyond the "bargained-for exchange of labor for mutual economic gain that occurs in a true employer-employee relationship." *Harker*, 990 F.2d at 133 (internal quotations omitted).

### C.

The Supreme Court has written that the term "employee" should be defined in light of the purposes of the FLSA, and an analysis of the Act's purposes bolsters our conclusion. The FLSA's scope must be determined by "recognizing that we are dealing with human beings and with a statute that is intended to secure to them the fruits of their toil and exertion." *Muscoda*, 321 U.S. at 592. In *Rutherford*, 331 U.S. at 723-24, the Court instructed us to treat as "persuasive" under the FLSA its related precedent in *United States v. Silk*, which defined "employee" status "in the light of the mischief to be corrected and the end to be attained" with "the primary consideration [being] whether effectuation of the declared policy and purposes of the Act comprehend securing to the individual the rights guaranteed and protection afforded by the Act," 331 U.S. 704, 713 (1947) (quoting *National Labor Relations Board v. Hearst Publ'ns, Inc.*, 322 U.S. 111, 124, 131-32 (1944) (internal quotations omitted)).

As a result, the FLSA applies to workers regardless of their protestations that they are not employees because "the purposes of the Act require that it be applied even to those who would decline its protections." *Tony & Susan Alamo Found.*, 471 U.S. at 302. Otherwise, "employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act." *Id.* In contrast, the FLSA does not apply to prospec-

tive railroad workers during on-the-job training, because coverage would not be necessary to prevent evasion of the Act when the workers in question benefitted from their training and the employer received no immediate advantage. *Walling*, 330 U.S. at 151-53.

Interpreting the FLSA in light of its purposes leads us to a similar conclusion with respect to the parties' relationship. We need not look hard to find Congress' purpose, as the Act's enacted findings state that it seeks to remedy "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a) (2000). It does so directly by imposing minimum wage and overtime requirements on employers, as well as indirectly, by protecting businesses from the "unfair method of competition" that arises when competing enterprises save costs by providing substandard working conditions. *Id. Harker* demonstrates how these objectives can illuminate the scope of the Act in specific cases. We held that a prison labor program was not subject to the FLSA in part because coverage would not serve the Act's purposes: the Department of Corrections provided for inmates' material needs already and another law prevented prison goods from being used in a manner that would threaten fair competition. *Harker*, 990 F.2d at 133-34.

Similarly, the FLSA's objectives would not be advanced by federal interposition in the relationship in this case. Retroactively substituting the uniform federal standard tailored to the traditional workplace for the fluid and informal financial arrangement of the couple here would bear no relation to the purposes of the Act. Such an extension would not advance living conditions, given that the parties drew freely from the company's resources and lived well off them, but simply failed to conform their dealings to the FLSA framework. Nor would such an extension prevent the unfair competition that arises when businesses cut their costs by paying exploitatively low wages, as the degree of financial control the plaintiff possessed precluded such exploitation. To the extent that the parties' sharing of risk and reward created incentives for hard work and good management, this advantage amounts to fair competition, akin to the partnerships and other profit-sharing arrangements that the Act evinces no intent to outlaw.

III.

Our holding is limited, as befits an examination of an unorthodox financial relationship in an area not governed by bright-line rules. We certainly do not say that one member of a romantic couple can never be an employee of another.[2] But when long-term partners perform many of the same duties in a small business and live off its proceeds, with each free to incur substantial personal expenses paid by the business, we do not confront the employer-employee relationship that the FLSA contemplates.

This does not leave the plaintiff without recourse. She may well have an ownership interest in Hair of the Dog, an action for fraud or breach of contract, or a basis for recovery under a theory of quantum meruit or unjust enrichment, and we note that the plaintiff has brought all these claims. State law has provided mechanisms for dealing with the dissolution of domestic and business relationships for centuries, and the North Carolina Wage and Hour Act may supplement those remedies. But broad as the FLSA's coverage is, the statute was not meant to be an omnibus financial relations act, imposing a one-size-fits-all federal solution upon all sorts of human relationships and available as a weapon upon the dissolution of all domestic partnerships and other intimate arrangements involving shared funds and shared labor. "Such an extension on our part would be no small excursion into the arena of public policy," *Harker*, 990 F.2d at 136, and because we see no evidence that Congress intended the FLSA to so restructure all manner of personal and financial dealings, we decline the plaintiff's invitation to push the Act to this new frontier. The judgment of the district court is therefore

*AFFIRMED.*

---

[2]We therefore agree with our friend in concurrence that the inquiry here is not into "interference with or interpretation of the parties' domestic relationship." We simply hold that in light of all the circumstances, the parties' professional and financial arrangements cannot be described as the employer-employee relationship contemplated by the FLSA.

GREGORY, Circuit Judge, concurring in the judgment:

I agree that this Court should affirm the judgment below because Tammy Steelman has not proven that she is an employee for purposes of the Fair Labor Standards Act ("FLSA"). I am not however of the view that the inquiry here concerns interference with or interpretation of the parties' domestic relationship.

Simply stated, Steelman's FLSA claim fails because there is no evidence that she "work[ed] in contemplation of compensation"— whether in the form of wages or benefits—for her labor. *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 306 (1985). Rather, as the facts recounted by the majority show, Steelman worked to build a business with Michelle Hirsch, without regard to any precise compensation for the precise hours she labored at Hair of the Dog. She worked for her and Hirsch's shared advantage—"for their future," as Steelman testified. *Cf. Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947) (denying that such scenario constitutes employment). Moreover, she described a financial arrangement that became the best evidence that she and Hirsch had not made the "*arms' length*," "bargained-for exchange of labor for mutual economic gain" that typically occurs in employment relationships. *Harker v. State Use Indus.*, 990 F.2d 131, 133 (4th Cir. 1993) (emphasis added). For this reason, I concur in the judgment.