Zagaroli v. Neill, 2017 NCBC 101.

STATE OF NORTH CAROLINA

CATAWBA COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 2635

PETE ZAGAROLI,

      Plaintiff and Counterclaim
Defendant,

v.

JAMES CLAYTON NEILL;
RICK BERRY; NEILL GRADING
AND CONSTRUCTION COMPANY,
INC.; and RECLAMATION, LLC,

      Defendants and
Counterclaim/Third-Party
Plaintiffs,

v.

BENCHMADE, LLC and DEAN
PRITCHETT,

      Third-Party Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION FOR
JUDGMENT ON THE PLEADINGS
AND PLAINTIFF'S MOTION TO
AMEND**

1.    **THIS MATTER** is before the Court on Defendants' Motion for Judgment on the Pleadings and Plaintiff's Motion to Amend First Amended Complaint (collectively, the "Motions"). Having considered the Motions, the briefs, and the arguments of counsel at a hearing on the Motions, the Court **GRANTS in part** and **DENIES in part** Defendants' motion and **DENIES** Plaintiff's motion.

*Law Offices of Matthew K. Rogers, by Matthew K. Rogers, for Plaintiff Pete Zagaroli and Third-Party Defendant Benchmade, LLC.*

*Young, Morphis, Bach & Taylor, LLP, by Paul E. Culpepper and Timothy D. Swanson, for Defendants James Clayton Neill, Rick Berry, Neill Grading and Construction Company, Inc., and Reclamation, LLC.*

Robinson, Judge.

## I.   FACTUAL BACKGROUND

2.     The Court does not making findings of fact on Defendants' Motion for Judgment on the Pleadings, but only recites those factual allegations of the First Amended Complaint that are relevant and necessary to the Court's determination of the motion.

3.     Plaintiff Pete Zagaroli ("Plaintiff") is a resident of Catawba County, North Carolina.  (First Am. Compl. ¶ 1, ECF No. 2; Answer, Countercl. & Third-Party Compl. ¶ 1, ECF No. 12 ["Answer"].)  Plaintiff was, at one time, a construction general contractor who built new construction, renovations, and additions.  (First Am. Compl. ¶ 9; Answer ¶ 9.)

4.     Defendants James Clayton Neill ("Clay") and Rick Berry ("Rick") are also residents of Catawba County.  (First Am. Compl. ¶¶ 2−3; Answer ¶¶ 2−3.)

5.     Defendant Neill Grading and Construction Company, Inc. ("Neill Grading") is a North Carolina corporation with its principal place of business in Hickory, North Carolina.  (First Am. Compl. ¶ 4; Answer ¶ 4.)  Neill Grading is owned and operated by Clay and his family.  (First Am. Compl. ¶ 5.)

6.     Defendant Reclamation, LLC ("Reclamation") is a North Carolina limited liability company with its principal place of business in Catawba County.  (First Am. Compl. ¶ 7.)

7.     From 2007 through 2010, Plaintiff researched and evaluated various ways to make money from renovating historic factories and mills.  (First Am. Compl. ¶ 10;

Answer ¶ 10.) Plaintiff sought out professionals with experience in renovating mills to obtain tax credits and began working with James Maynard, an architect having significant experience with historic mills. (First Am. Compl. ¶ 11.)

8. On three separate occasions between 2007 and July 31, 2009, Plaintiff contracted to purchase an abandoned hosiery mill property called the Hollar Hosiery Mill (the "Hollar Mill"). (First Am. Compl. ¶ 12.) On one of these occasions, Plaintiff approached Clay to partner in renovating the Hollar Mill. (First Am. Compl. ¶ 15.) Plaintiff informed Clay that Plaintiff had contracted to purchase the Hollar Mill, but that Plaintiff was financially unable to renovate it on his own. (First Am. Compl. ¶ 16.)

9. As a result of discussions between Plaintiff and Clay, Clay caused a limited liability company to contract for the purchase of the Hollar Mill in order to renovate and develop it consistent with Plaintiff's development plans. (First Am. Compl. ¶ 17.) Plaintiff understood that he was partnering with Clay to develop the Hollar Mill and that Plaintiff would perform and profit from design, construction administration, and project oversight. (First Am. Compl. ¶ 19.) Plaintiff alleges that he and Clay agreed that if Plaintiff did not perform design, construction administration, and project oversight, Plaintiff would be paid twenty-five percent of the profits from the business. (First Am. Compl. ¶ 19.)

10. In 2009, Plaintiff prepared a general business plan for the renovation of historic factories and mills throughout Catawba County, including the Hollar Mill, Moretz Mills, and Lyerly Mills (the "Wingfoot Business Plan"). (First Am. Compl.

¶¶ 21–22.) Clay and Rick expressed a desire to partner with Plaintiff in the Wingfoot Business Plan. (First Am. Compl. ¶ 23.)

11.    Plaintiff prepared development concept drawings and pro forma profit statements and performed cost analyses for renovation of the Hollar Mill. (First Am. Compl. ¶ 31.) Clay and Plaintiff used Plaintiff's designs and cost analyses to solicit numerous potential tenants for the Hollar Mill, including Lenoir-Rhyne and Dale Jarrett. (First Am. Compl. ¶ 33; Answer ¶ 33.)

12.    In September 2009, Clay formed Hollar Hosiery Investments, LLC ("HHI"). (First Am. Compl. ¶ 20; Answer ¶ 20.) At this same time, Plaintiff alleges that he commenced construction on the Hollar Mill in reliance on his partnership with Clay and Rick. (First Am. Compl. ¶ 27.) Plaintiff alleges that in or around 2010, a gentleman's partnership agreement existed between Plaintiff and Clay to evaluate and make money in all possible ways from historic mill renovation and reclamation of materials from mills. (First Am. Compl. ¶ 38.)

13.    In November 2010, members of HHI contracted directly with Plaintiff's construction company, Zagaroli Construction Company, Inc. ("Zagaroli Construction"), for construction work at the Hollar Mill. (First Am. Compl. ¶ 42.) In or around the end of 2010, however, Plaintiff expressed to Clay that Zagaroli Construction needed money and that Plaintiff could not continue to spend time and money on the Hollar Mill renovation without being timely compensated. (First Am. Compl. ¶ 43.) Plaintiff further told Clay that Plaintiff's dedication to the Wingfoot Business Plan and the Hollar Mill had caused Plaintiff's financial condition to

deteriorate and, unless Plaintiff was timely paid for his work, he may not be able to renew his general contractor's license. (First Am. Compl. ¶ 44.) Plaintiff alleges that, in response, Clay told Plaintiff that Plaintiff was vital to, and must remain a part of, the Wingfoot Business Plan and the Hollar Mill renovation, and that if Plaintiff could not be the general contractor for the renovations, then Plaintiff would be paid to solicit and supervise other general contractors to perform the renovation work for the Hollar Mill. (First Am. Compl. ¶¶ 45–46.)

14. At some time thereafter, Plaintiff approached furniture companies with which he had a personal relationship for the purpose of selling furniture he had made. (First Am. Compl. ¶ 54.) One such company, Mitchell Gold, expressed interest in purchasing furniture made from reclaimed materials. (First Am. Compl. ¶ 54.) Because Plaintiff did not have sufficient funds, Plaintiff asked Clay if Clay was interested in funding furniture manufacturing from reclaimed materials. (First Am. Compl. ¶¶ 55–56; Answer ¶¶ 55–56.) Clay stated that he was interested and suggested that they solicit investment from Rick. (First Am. Compl. ¶ 57.) Rick committed to contributing $26,000 in start-up capital. (First Am. Compl. ¶ 57; Answer ¶ 57.)

15. Plaintiff alleges that he told Clay and Rick that Plaintiff could not provide furniture manufacturing services unless he was paid for his work. (First Am. Compl. ¶ 58.) As a result, Plaintiff alleges that Clay and Rick promised to pay Plaintiff at least $1,000 per week for his furniture reclamation work. (First Am. Compl. ¶ 59.) Clay and Rick told Plaintiff that they were partners and that Plaintiff was a thirty

percent owner, but that because of Zagaroli Construction's financial condition, they all agreed that Plaintiff would be an unnamed partner. (First Am. Compl. ¶¶ 59–61, 63; Answer ¶¶ 59, 61, 63.) Clay and Rick were also thirty percent owners, and Ryan Lovern, a commercial real estate broker, was a ten percent owner. (First Am. Compl. ¶¶ 62–63; Answer ¶¶ 62–63.)

16. On February 18, 2011, Clay formed Reclamation. (First Am. Compl. ¶ 64; Answer ¶ 64.) Clay told Plaintiff that Plaintiff was a thirty percent owner of Reclamation. (First Am. Compl. ¶ 65; Answer ¶ 65.)

17. Plaintiff alleges that he was first paid his $1,000 per week salary in May 2011. (First Am. Compl. ¶ 75.) In July 2011, Plaintiff notified Clay and Rick that Reclamation did not have funds to pay Plaintiff's $1,000 per week salary. (First Am. Compl. ¶ 78.) Plaintiff alleges that he was paid $22,000 in salary in 2011. (First Am. Compl. ¶ 84.)

18. In May 2012, Plaintiff requested that Clay pay Plaintiff for his construction administration and design services regarding the Hollar Mill, alleging that Clay promised to pay him at least $35,000 for his work at the Hollar Mill. (First Am. Compl. ¶ 87.)

19. In 2012, Plaintiff was performing all aspects of Reclamation's business. (First Am. Compl. ¶ 94; Answer ¶ 94.) In the summer of 2012, Plaintiff notified Clay and Rick that Reclamation needed additional funds to ensure that Plaintiff was paid his $1,000 per week salary. (First Am. Compl. ¶ 98.) Plaintiff contends that Reclamation continued to have insufficient cash flow to pay him the minimum weekly

compensation promised by Clay and Rick, and that Reclamation paid the weekly salary only when Reclamation had sufficient funds. (First Am. Compl. ¶ 101.) Plaintiff avers that in 2012, he was paid $29,500 in salary. (First Am. Compl. ¶ 115.)

20. At the end of 2012, Plaintiff alleges that Clay and Rick agreed that Reclamation owed Plaintiff $22,500 in back wages for 2012, which they agreed should be characterized as debt owed by Reclamation to Plaintiff. (First Am. Compl. ¶ 116.)

21. Plaintiff avers that, on or about October 25, 2013, relying on the Wingfoot Business Plan and connections established from experience with historic renovation projects obtained by and through Plaintiff, Clay and Neill Grading obtained substantial financing for the Moretz Mills project. (First Am. Compl. ¶ 128.) Plaintiff alleges that Clay did not provide the Moretz Mills opportunity to the partnership or Reclamation. (First Am. Compl. ¶ 129.)

22. Plaintiff alleges that in 2013, he was not paid any salary from Reclamation and was owed $52,000 in unpaid salary at the end of the year. (First Am. Compl. ¶ 136.)

23. Plaintiff avers that Clay continued to promise Plaintiff payments relating to Plaintiff's design and development work at historic factories and mills, including the Hollar Mill. (First Am. Compl. ¶ 138.)

24. By February 2015, Reclamation's operations had completely ceased. (First Am. Compl. ¶ 146.)

## II.     PROCEDURAL HISTORY

25.     The Court sets forth here only those portions of the procedural history relevant to its determination of the Motions.

26.     Plaintiff filed his Complaint on October 26, 2015, (ECF No. 1), and his First Amended Complaint on March 21, 2016, (ECF No. 2).  The First Amended Complaint asserts the following claims for relief: (1) breach of fiduciary duty, constructive fraud, and fraud ("First Claim"); (2) self-dealing and misappropriation of corporate opportunities ("Second Claim"); (3) quasi-contract and unjust enrichment ("Third Claim"); (4) breach of contract ("Fourth Claim"); (5) violation of the North Carolina Wage and Hour Act (the "Wage and Hour Act") ("Fifth Claim"); and (6) defamation ("Sixth Claim").  (First Am. Compl. 14, 16–19.)

27.     This action was designated as a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated April 14, 2016, (ECF No. 4), and assigned to Chief Business Court Judge James L. Gale that same day, (ECF No. 5).  This case was later reassigned to the undersigned by order dated July 5, 2016.  (ECF No. 19.)

28.     On May 18, 2016, Defendants filed their Answer, Counterclaim and Third-Party Complaint against Benchmade, LLC ("Benchmade") and Dean Pritchett ("Pritchett").  (ECF No. 12.)

29.     On July 18, 2016, Plaintiff filed his reply to Defendants' counterclaims. (ECF No. 21.)

30. On August 1, 2016, Benchmade filed its answer to Defendants' third-party complaint. (ECF No. 22.)

31. On October 14, 2016, Plaintiff inexplicably filed a "revised" reply to Defendants' counterclaims, which Defendants did not contest. (ECF No. 32.)

32. On October 31, 2016, the Court entered default in favor of third-party plaintiffs against Pritchett. (ECF No. 37.)

33. On May 26, 2017, Defendants filed the Motion for Judgment on the Pleadings pursuant to Rule 12(c) of the North Carolina Rules of Civil Procedure ("Rules(s)") (the "Rule 12(c) Motion"). (ECF No. 52.) Defendants' Rule 12(c) Motion seeks judgment on the pleadings on Plaintiff's Second (self-dealing and misappropriation of corporate opportunities), Third (quasi contract and unjust enrichment), and Fifth (Wage and Hour Act) Claims. (Defs.' Mot. J. Pleadings ¶ 6, ECF No. 52.)

34. On June 16, 2017, Plaintiff filed his Motion to Amend First Amended Complaint (the "Motion to Amend"). (ECF No. 61.)

35. The Motions have been fully briefed, and the Court held a hearing on the Motions on August 9, 2017. The Motions are now ripe for resolution.

### III.    RULE 12(c) MOTION

36. The Rule 12(c) Motion seeks judgment on the pleadings on Plaintiffs' Third and Fifth Claims on the ground that the factual allegations of the First Amended Complaint reveal that Defendants are entitled to judgment as a matter of law on these claims. (Br. Supp. Defs.' Mot. J. Pleadings 7–10, ECF No. 54.) The Rule 12(c)

Motion seeks judgment on the pleadings on Plaintiffs' Second Claim on the grounds that the claim is derivative and, as such, Plaintiff does not have standing to assert the claim individually. (Br. Supp. Defs.' Mot. 6–7.) Accordingly, the Court first considers the Rule 12(c) Motion as to Plaintiffs' Third and Fifth Claims, and then considers the motion as to Plaintiffs' Second Claim.

### A. Legal Standard

37. "A motion for judgment on the pleadings should not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Carpenter v. Carpenter*, 189 N.C. App. 755, 761, 659 S.E.2d 762, 767 (2008). On a Rule 12(c) motion, "[t]he movant is held to a strict standard and must show that no material issue of facts exists and that he is clearly entitled to judgment." *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974). "[T]he court cannot select some of the alleged facts as a basis for granting the motion on the pleadings if other allegations, together with the selected facts, establish material issues of fact." *J. F. Wilkerson Contracting Co. v. Rowland*, 29 N.C. App. 722, 725, 225 S.E.2d 840, 842 (1976). The Court must read the pleadings in the light most favorable to the nonmoving party, and

> [a]ll well pleaded factual allegations in the nonmoving party's pleadings are taken as true and all contravening assertions in the movant's pleadings are taken as false. All allegations in the nonmovant's pleadings, except conclusions of law, legally impossible facts, and matters not admissible in evidence at the trial, are deemed admitted by the movant for purposes of the motion.

*Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499 (citations omitted).

38. "Judgment on the pleadings is not favored by the law . . . ." *Huss v. Huss*, 31 N.C. App. 463, 466, 230 S.E.2d 159, 162 (1976). The function of Rule 12(c) "is to dispose of baseless claims or defenses when the formal pleadings reveal their lack of merit." *Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499. "[J]udgment on the pleadings is not appropriate merely because the claimant's case is weak and he is unlikely to prevail on the merits." *Huss*, 31 N.C. App. at 469, 230 S.E.2d at 163. "A motion for judgment on the pleadings is allowable only where the pleading of the opposite party is so fatally deficient in substance as to present no material issue of fact . . . ." *George Shinn Sports, Inc. v. Bahakel Sports, Inc.*, 99 N.C. App. 481, 486, 393 S.E.2d 580, 583 (1990).

**B.    Quasi Contract and Unjust Enrichment (Third Claim)**

39. Plaintiff's Third Claim for quasi contract and unjust enrichment seeks to recover for, among other things, renovation and construction work Plaintiff alleges that he performed for Defendants. (First Am. Compl. ¶¶ 189−92.) Defendants argue that they are entitled to judgment as a matter of law on this claim because Plaintiff alleges that the parties entered into express agreements regarding Plaintiff's renovation work, and an express contract precludes recovery under an implied contract theory. (Br. Supp. Defs.' Mot. 7−8.)

40. An unjust enrichment claim is a claim in quasi contract or a contract implied in law. *M Series Rebuild, LLC v. Town of Mount Pleasant*, 222 N.C. App. 59, 67, 730 S.E.2d 254, 260 (2012). "A quasi contract or a contract implied in law is not a contract. The claim is not based on a promise but is imposed by law to prevent an

unjust enrichment. If there is a contract between the parties the contract governs the claim and the law will not imply a contract." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988). "Only in the absence of an express agreement of the parties will courts impose a quasi contract or a contract implied in law in order to prevent an unjust enrichment." *Paul L. Whitfield, P.A. v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412, 415 (1998).

41. Notwithstanding that an express contract precludes an implied contract concerning the same matter, it is also well established under North Carolina law that a party may plead claims in the alternative. *James River Equip., Inc. v. Mecklenburg Utils., Inc.*, 179 N.C. App. 414, 419, 634 S.E.2d 557, 560 (2006) (concluding that plaintiff may plead her express contract and quantum meruit claims in the alternative even though plaintiff may not ultimately be able to prevail on both). Indeed, our Court of Appeals has held that "a party who seeks recovery in *quantum meruit* while also seeking to recover on an express contract should ideally plead these claims in the alternative in her complaint[.]" *Law Offices of Peter H. Priest, PLLC v. Coch*, 780 S.E.2d 163, 173 (N.C. Ct. App. 2015). Notwithstanding that Plaintiff ideally should have pleaded these claims expressly in the alternative, "under certain facts a plaintiff is not required to identify alternatively pleaded claims expressly as such, because [Rule] 8(e)(2) does not mandate a particular form for phrasing alternative claims." *Kingsdown, Inc. v. Hinshaw*, 2016 NCBC LEXIS 15, at *29 n.9 (N.C. Super. Ct. Feb. 17, 2016); *see also Bandy v. Gibson*, 2017 NCBC LEXIS 66, at *11−12 (N.C. Super. Ct. July 26, 2017) ("[Defendants] cite no authority in support of

[their] argument that failure to specifically plead unjust enrichment 'in the alternative' requires dismissal of her claim.").

42. Therefore, although Plaintiff may not ultimately be able to prevail on both his breach of contract and quasi contract claims, at this stage, the Court cannot conclude as a matter of law that Plaintiff is precluded from recovery on his quasi contract claim. Accordingly, Defendants' Rule 12(c) Motion as to Plaintiff's Third Claim is denied.

## C. Violation of the Wage and Hour Act (Fifth Claim)

43. Plaintiff's Fifth Claim alleges that "Reclamation, [Clay] and/or [Rick]" violated the Wage and Hour Act by failing to pay Plaintiff his $1,000 per week salary. (First Am. Compl. ¶ 205.) Defendants argue that they are entitled to judgment as a matter of law on this claim because the First Amended Complaint lacks sufficient allegations to state that Plaintiff is an "employee" as that term is defined in the Wage and Hour Act. (Br. Supp. Defs.' Mot. 9–10.)

44. Although the First Amended Complaint does not specify which provision of the Wage and Hour Act it contends Defendants violated, the Court reads the allegations as asserting a violation of N.C. Gen. Stat. § 95-25.6, which provides, in relevant part, that "[e]very employer shall pay every employee all wages and tips accruing to the employee on the regular payday." N.C. Gen. Stat. § 95-25.6. The Wage and Hour Act defines "employee" as "any individual employed by an employer." *Id.* § 95-25.2(4). Our Court of Appeals has concluded that the Wage and Hour Act is modeled after the federal Fair Labor Standards Act ("FLSA") and, "[a]s such, '[i]n

interpreting the [Wage and Hour Act], North Carolina courts look to the FLSA for guidance.'" *Powell v. P2Enterprises, LLC*, 786 S.E.2d 798, 800 (N.C. Ct. App. 2016) (second alteration in original).

45. The FLSA's definition of "employee" is likewise defined as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). Federal decisions have determined that the term "employee" is to be broadly construed. *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 133 (4th Cir. 2017); *Steelman v. Hirsch*, 473 F.3d 124, 128 (4th Cir. 2007). "[I]n determining whether a worker is an employee covered by the FLSA, a court considers the 'economic realities' of the relationship between the worker and the putative employer . . . ." *Salinas*, 848 F.3d at 150 (emphasis omitted). Courts consider a number of factors and examine the totality of the circumstances in analyzing employee status. *Id.*; *Steelman*, 473 F.3d at 128−29. "The focal point is whether the worker is economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself." *Salinas*, 848 F.3d at 150 (alteration in original) (quotation marks omitted).

46. Defendants argue that Plaintiff is not an "employee" as a matter of law because Plaintiff alleges that he was a partner, and general partners are not "employees" within the meaning of the Wage and Hour Act, relying on *Steelman*. (Br. Supp. Defs.' Mot. 9.) In *Steelman*, plaintiff and defendant were both romantic and business partners who lived together and worked side-by-side in operating their business. *Steelman*, 473 F.3d at 125. Plaintiff and defendant's bills, as well as each of their personal expenses, were paid from the business proceeds, and they took the

company's successes and failures into account when making spending decisions. *Id.* at 126. The district court granted summary judgment in favor of defendant on plaintiff's FLSA claim, concluding that plaintiff was a partner, rather than an "employee." *Id.* at 127.

47. The Fourth Circuit Court of Appeals affirmed, concluding that "general partners in a business are not covered by the FLSA[,]" and that "attributes of partnership such as exposure to risk, managerial control, and the ability to share in profits 'introduce complexities and economic realities which are not consonant with employee status.'" *Id.* at 129 (citations omitted) (quoting *Wheeler v. Hurdman*, 825 F.2d 257, 275 (10th Cir. 1987)). The Court of Appeals reasoned as follows:

> The intended lifetime partnership [plaintiff] described was not the bargained-for exchange of labor for mutual economic gain that occurs in a true employer-employee relationship. According to the plaintiff, the couple saw their work together as a way to improve an economic future that they intended to share in perpetuity, rather than as a transfer of one individual's assets to another in exchange for labor. The plaintiff did not obtain a bargained-for portion of her supposed employer's assets -- she took from those assets for her own purposes with a discretion that is fundamentally alien to employer-employee relationships.
>
> . . . .
>
> Such extensive access to company funds is not the kind of privilege that employees enjoy with respect to their employers' revenue. Indeed, the plaintiff's ability to draw compensation from the company exceeded the financial control typical in the partnerships that the plaintiff does not dispute fall outside the FLSA. When the plaintiff lived comfortably and exclusively off the proceeds of the business and exerted authority in disposing of its funds, we find it hard to see the bargain exchanging labor for compensation that marks employment arrangements.

*Id.* at 130 (citation and quotation marks omitted).

48. As *Steelman* and other cases make clear, however, "[t]he determination of employee status is very fact intensive," *Herman v. Express Sixty-Minutes Delivery Servs., Inc.*, 161 F.3d 299, 305 (5th Cir. 1998), and "a person's title alone should not be dispositive in the analysis[,]" *Harris v. Universal Contracting, LLC*, No. 2:13-CV-00253 DS, 2014 U.S. Dist. LEXIS 81105, at *5 (D. Utah June 12, 2014). In *Harris*, the district court squarely addressed the issue of whether a member of a limited liability company can also be an "employee" of that company. In so doing, the court noted that "no controlling court has addressed the direct question of whether LLC members can also be employees under this vague definition [of employee] in the FLSA," and the court applied a six-factor test to address the issue. *Harris*, 2014 U.S. Dist. LEXIS 81105, at *5, *7–9. After a fact-intensive inquiry, the court granted summary judgment in favor of plaintiff on his FLSA claim, concluding that the members were subject to the company's control and, thus, were "employees" as defined by the FLSA. *Id.* at *13.

49. Likewise, in *Kehler v. Albert Anderson, Inc.*, No. 16-5318 (JBS/KMW), 2017 U.S. Dist. LEXIS 58826 (D.N.J. Apr. 18, 2017), defendants moved to dismiss plaintiff's FLSA claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that plaintiff's claim must be dismissed because plaintiff alleged that he was an owner, not an "employee." The court concluded that plaintiff sufficiently pleaded that he was an "employee" under the FLSA. *Id.* at *14. In so concluding, the court recognized that "[c]ourts have struggled with characterizing putative owners and partners that also perform work for their companies, like [p]laintiff here, as the

economic realities test is generally used to distinguish between employees and independent contractors, not employees and owners." *Id.* at *14–15. The court distinguished *Steelman* on the ground that *Steelman* concerned a partnership while *Kehler* concerned a close corporation, and the court emphasized the acute vulnerability of minority shareholders in closely held corporations. *Id.* at *15–16.

50. In light of the highly fact-dependent nature of employee status, the Court cannot conclude as a matter of law, based solely on the pleadings, that Plaintiff was not an employee of Reclamation, Clay, or Rick within the meaning of the Wage and Hour Act. Although Plaintiff alleges that he was a partner and an interest owner in Reclamation, a party may claim ownership and employee status in the alternative, *Steelman*, 473 F.3d at 128, and Plaintiff alleges that he agreed to work for Reclamation based on Clay and Rick agreeing to ensure that Reclamation had sufficient capital and operating funds to pay Plaintiff a salary of $1,000 per week, (First Am. Compl. ¶ 196). Plaintiff additionally alleges that Clay knew that Plaintiff was financially dependent on Clay and Rick, (First Am. Compl. ¶ 175), and "the FLSA applies to workers regardless of their protestations that they are not employees because 'the purposes of the [FLSA] require that it be applied even to those who would decline its protections[,]'" *Steelman*, 473 F.3d at 131 (quoting *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 302 (1985)). While a fact-intensive inquiry may reveal that Plaintiff is not an employee within the meaning of the Wage and Hour Act, the Court is unable to conduct that analysis based solely on the pleadings. Therefore, Defendants' Rule 12(c) Motion as to Plaintiff's Fifth Claim is denied.

## D. Self-Dealing and Misappropriation of Corporate Opportunities (Second Claim)

51. Plaintiff's Second Claim alleges the following:

> 183. Upon information and belief, [Clay] used his partnership with [Plaintiff] to obtain business information intending not to provide such to or for the benefit of the partnership or Reclamation, but rather, for Neill Grading to benefit from business opportunities that should've been partnership or Reclamation opportunities.
>
> 184. [Clay] did not disclose to the partnership nor [sic] provide the partnership opportunities to the partnership nor [sic] Reclamation opportunities that [Clay] was required to offer to the partnership and/or Reclamation, but in violation of duties to partnership [sic] used partnership information for the benefit of businesses associated with [Clay] including without limitation Neill Grading.

(First Am. Compl. ¶¶ 183–84.) Defendants argue that Plaintiff lacks standing to assert this claim because it is a derivative claim that must be brought on behalf of Reclamation, and Plaintiff has not made a proper demand on Reclamation. (Br. Supp. Defs.' Mot. 6–7.)

52. "Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction[,]" *Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 113, 574 S.E.2d 48, 51 (2002), and a court may consider matters outside the pleadings in determining whether subject matter jurisdiction exists, *Keith v. Wallerich*, 201 N.C. App. 550, 554, 687 S.E.2d 299, 302 (2009). However, "if the trial court confines its evaluation [of standing] to the pleadings, the court must accept as true the plaintiff's allegations and construe them in the light most favorable to the plaintiff." *Munger v. State*, 202 N.C. App. 404, 410, 689 S.E.2d 230, 235 (2010); *see also Neuse River Found., Inc.*, 155 N.C. App. at 113, 574 S.E.2d at 51 ("[E]ach element

[of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."). Although Plaintiff attached numerous exhibits to his response in opposition to Defendants' Rule 12(c) Motion, (ECF Nos. 69–71, 73–82), the exhibits cited in his response do not affect the Court's analysis of Plaintiff's standing. Accordingly, the Court confines its analysis of Plaintiff's standing to the pleadings and views the allegations of the First Amended Complaint in the light most favorable to Plaintiff.

### 1. Corporate Opportunities

53. It is a well-settled principle of North Carolina law that shareholders of a corporation cannot pursue individual causes of action for wrongs or injuries to the corporation. *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658, 488 S.E.2d 215, 219 (1997); *Corwin v. British Am. Tobacco PLC*, 796 S.E.2d 324, 338 (N.C. Ct. App. 2016). This same standard applies for purposes of determining whether a member of a limited liability company can assert an individual, as opposed to a derivative, claim. *Levin v. Jacobson*, 2015 NCBC LEXIS 111, at *14–15 (N.C. Super. Ct. Dec. 7, 2015); *see* Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 34.04[5] (7th ed. 2016) ("A derivative action on behalf of an LLC will be governed by essentially the same rules that apply to a derivative action on behalf of a corporation.").

54. There are two exceptions to the general requirement of derivative claims: (1) when there is a special duty between the wrongdoer and the member; and (2) when the member suffered an injury separate and distinct from the injury suffered by the

limited liability company and the other members. *Barger*, 346 N.C. at 658, 488 S.E.2d at 219; *Corwin*, 796 S.E.2d at 338; *Levin*, 2015 NCBC LEXIS 111, at *14–15; *see* Robinson § 34.04[5] ("[W]hether the member must bring the suit individually or on behalf of the LLC turns on whether the alleged injuries were caused directly to the member or are a consequence of breaches of fiduciary duty that harmed the LLC.").

### a.    Special Duty

55.    For the special duty exception to apply, "the duty must be one that the alleged wrongdoer owed directly to the shareholder as an individual"—a duty that was personal to the shareholder and separate and distinct from the duty owed to the corporation. *Barger*, 346 N.C. at 659, 488 S.E.2d at 220. In *Barger*, our Supreme Court set forth an illustrative, non-exclusive list of situations in which a special duty may be found. This non-exhaustive list includes when the wrongdoer induced plaintiff to become a shareholder, the wrongdoer violated his fiduciary duty to the shareholder, the wrongdoer performed individualized services directly for the shareholder, and the wrongdoer undertook to advise shareholders independently of the corporation. *Id.*

56.    Plaintiff argues that "[s]pecial duties owing to [Plaintiff] included promises owing to [Plaintiff] which induced him to be a part thereof, including [Reclamation] helping [Plaintiff] carry (if not carrying) the cost of the Yount Mill and Zag Building (and buying each from [Plaintiff]) as an obligation owing to [Plaintiff]." (Pl.'s Resp. Defs.' Mot. J. Pleadings 12, ECF No. 68.) The First Amended Complaint does not allege, however, that Defendants induced Plaintiff to become a member of

Reclamation or that Plaintiff contributed any capital to Reclamation. Although Plaintiff alleges that he loaned funds to Reclamation, Plaintiff could withdraw the loaned funds at any time and in his sole discretion. (First Am. Compl. ¶¶ 117, 119, 124–25.) Moreover, there is no allegation that Defendants induced Plaintiff to make any such loan. *See Green v. Freeman*, 367 N.C. 136, 143, 749 S.E.2d 262, 269 (2013) (stating that courts apply the same rules for establishing a special duty when plaintiff is a creditor as courts apply when plaintiff is a shareholder).

57. Additionally, Plaintiff argues that he "was owed special duties as an 'unnamed' partner" in Reclamation. (Pl.'s Resp. Defs.' Mot. 13.) It is well established, however, that members of a limited liability company do not owe fiduciary duties to each other or to the company, except a controlling member owes fiduciary duties to minority members. *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 473, 675 S.E.2d 133, 137 (2009). Although "a minority shareholder exercising actual control over a corporation may be deemed a 'controlling shareholder' with a concomitant fiduciary duty to the other shareholders[,]" *Corwin*, 796 S.E.2d at 330, "we begin with the general presumption that a minority shareholder is not in control of a corporation's conduct[,]" *id.* at 332. In order to rebut this presumption, Plaintiff "must allege specific facts demonstrating or allowing for the reasonable inference of actual control by that shareholder." *Id.* Here, Plaintiff has neither alleged any such facts nor argued that Defendants exercised domination and control over Reclamation's operations—indeed, Plaintiff alleges that neither Clay nor Rick participated in

Reclamation's operations, and that Plaintiff was primarily responsible for Reclamation's business. (First Am. Compl. ¶¶ 68, 94.)

### b. Special Injury

58. For the special injury exception to apply, the injury must be peculiar or personal to the shareholder. *Barger*, 346 N.C. at 659, 488 S.E.2d at 220. "[A] plaintiff must show that its particular injury was 'separate and distinct from the injury sustained by the other shareholders or the corporation itself.'" *Raymond James Capital Partners, L.P. v. Hayes*, 789 S.E.2d 695, 702 (N.C. Ct. App. 2016) (quoting *Barger*, 346 N.C. at 659, 488 S.E.2d at 219).

59. "Misappropriation of corporate opportunities is logically a derivative claim, but not an individual claim, because the injury is to the corporation, not to an individual shareholder." *Plasman v. Decca Furniture (USA), Inc.*, 2016 NCBC LEXIS 80, at *38 (N.C. Super. Ct. Oct. 21, 2016) (citing *Meiselman v. Meiselman*, 309 N.C. 279, 307, 307 S.E.2d 551, 567 (1983)). Plaintiff's bare assertion in his brief that he "incurred specific damages separate from damages incurred by Reclamation[,]" and that "[e]vidence shows that *Reclamation failed* because Clay and [Rick] did not perform numerous promises to [Plaintiff,]" (Pl.'s Resp. Defs.' Mot. 13 (emphasis added)), is insufficient to state that Plaintiff suffered an injury separate from any injury sustained by Reclamation.

60. Plaintiff also appears to argue that, because no membership interests were distributed and no operating agreement was ever signed, there is a question as to whether Reclamation ever achieved corporate existence such that it could pursue

claims in its own name. (Pl.'s Resp. Defs.' Mot. 15–17.) Even assuming arguendo that no membership interests were distributed and no operating agreement was signed, this has no effect on Reclamation's existence as "[a]n LLC is formed at the time the articles of organization filed by the Secretary of State become effective." N.C. Gen. Stat. § 57D-2-20(b). Thus, whether or not, after Reclamation was formed, as Plaintiff alleges, membership interests were distributed or an operating agreement was signed are not determinative of Reclamation's corporate existence.

61. Therefore, to the extent that Plaintiff's Second Claim is based on Defendants' alleged misappropriation of opportunities belonging to Reclamation, a limited liability company, the Court concludes that Plaintiff must bring this claim as a derivative claim and, thus, Plaintiff does not have standing to assert an individual claim for self-dealing and misappropriation of corporate opportunities.

62. In order to have standing to bring a derivative claim, Plaintiff must have made a proper demand. N.C. Gen. Stat. § 57D-8-01(a); *Anderson v. Seascape at Holden Plantation, LLC*, 241 N.C. App. 191, 203, 773 S.E.2d 78, 87 (2015). In order for a member to bring a derivative claim on behalf of a limited liability company, the North Carolina Limited Liability Company Act requires that

> [t]he member made written demand on the LLC to take suitable action, and either (i) the LLC notified the member that the member's demand was rejected, (ii) 90 days have expired from the date the demand was made, or (iii) irreparable injury to the LLC would result by waiting for the expiration of the 90-day period.

N.C. Gen. Stat. § 57D-8-01(a)(2).

63.    Plaintiff argues that the "pleadings and evidence establish that [Plaintiff] made numerous demands in writing and in meetings over more than three years to cause [Defendants] to take specific actions, and [Plaintiff]'s demands were rejected and ignored."  (Pl.'s Resp. Defs.' Mot. 17.)  In support of this proposition, Plaintiff cites to multiple paragraphs of his Proposed Second Amended Complaint. Notwithstanding the fact that, as discussed below, the Court denies Plaintiff's Motion to Amend, the Proposed Second Amended Complaint is devoid of any allegation that Plaintiff made a proper demand on Reclamation to take suitable action.   The allegations of the proposed complaint to which Plaintiff cites are entirely irrelevant to the demand requirement.  At best, the proposed complaint alleges that Plaintiff made a written demand that Reclamation pay amounts owed to Plaintiff.  Even still, this is not a demand that Reclamation take suitable action regarding Defendants' alleged failure to disclose business opportunities belonging to Reclamation—the basis for Plaintiff's Second Claim for self-dealing and misappropriation of corporate opportunities.  *See Miller v. Burlington Chem. Co., LLC*, 2017 NCBC LEXIS 6, at *29−30 (N.C. Super. Ct. Jan. 27, 2017) (discussing the purpose of the demand requirement and stating that, in determining whether a proper demand to take suitable action was made, the court must compare the derivative claims against the specific demands plaintiff made).

64.    As Plaintiff has failed to allege that he made a proper demand on Reclamation to take suitable action, Plaintiff's Second Claim for self-dealing and misappropriation of corporate opportunities, to the extent that this claim is based on

opportunities belonging to Reclamation, must be dismissed for lack of subject matter jurisdiction.  The Court next turns to whether Plaintiff may assert this claim to the extent that it is based on opportunities allegedly belonging to a partnership.

### 2.    Partnership Opportunities

65.    Plaintiff argues that he has standing to assert his Second Claim for misappropriation of partnership opportunities because self-dealing is a breach of a partner's fiduciary duties to the other partners.  (Pl.'s Resp. Defs.' Mot. 9.)  The Court agrees with Plaintiff in part, as "[i]t is elementary that the relationship of partners is fiduciary and imposes on them the obligation of the utmost good faith in their dealings with one another in respect to partnership affairs[,]" and our Court of Appeals has concluded that self-dealing by one partner constitutes a breach of that partner's fiduciary duties to the other partners.  *Compton v. Kirby*, 157 N.C. App. 1, 15, 577 S.E.2d 905, 914 (2003).   Defendants do not argue otherwise; rather, Defendants argue that "any claim based on Defendants' purported self-dealing and misappropriation of business opportunities is either properly plead[ed] as breach of fiduciary duty claims (if it arose in a partnership context and prior to the formation of [Reclamation]) or is derivative and must be asserted on behalf of [Reclamation]." (Reply Br. Supp. Defs.' Mot. J. Pleadings 2, ECF No. 84.)  Plaintiff's First Claim for breach of fiduciary duty alleges the following:

> 164. As business partners relating to Hollar Mill, [the Wingfoot Business Plan] and Reclamation, each [Rick] and [Clay] owed fiduciary duties to [Plaintiff], including without limitation to act for the benefit of the partnership without conflicts of interests [sic] and to disclose all business opportunities for the benefit of the partnership in order that

the partners, including without limitation for [Plaintiff] benefit [sic] from and to the extent available, profit from partnership opportunities.

. . . .

170. [Clay] and [Rick] breached fiduciary duties to [Plaintiff] by directing business opportunities intended for the partnership to businesses owned by or benefitting [Rick] and/or [Clay], and not to the partnership.

. . . .

173. [Clay] and/or [Rick] breached fiduciary duties to [Plaintiff] and committed constructive fraud by using [the Wingfoot Business Plan] to obtain the business solicited by [Plaintiff], and using partnership resources for Neill Grading to obtain the business without providing the partnership or Reclamation with the opportunities . . . .

. . . .

177. By 2015, due in part to self-dealing of [Clay] and breaches of duties to [Plaintiff], Reclamation was unable to continue operations.

(First Am. Compl. ¶¶ 164, 170, 173, 177.) It is clear that Plaintiff's Second Claim for self-dealing and misappropriation of corporate opportunities, to the extent this claim seeks individual relief, is identical to, and unnecessarily duplicative of, Plaintiff's First Claim for breach of fiduciary duty.

66. To the extent that Plaintiff's Second Claim asserts a partnership claim, this claim must fail. As a preliminary matter, the Court notes that, unlike a shareholder or member who seeks to bring a claim belonging to the corporation or limited liability company, a partner who seeks to bring a claim belonging to the general partnership is not required to make a pre-suit demand on the partnership. *See* N.C. Gen. Stat. § 59-31 *et seq.*; *Gillespie v. Majestic Transp., Inc.*, 2016 NCBC LEXIS 69, at *19−20 (N.C. Super. Ct. Sept. 6, 2016). Nonetheless, it is not clear whether, in the absence

of express authority set forth in a partnership agreement or consent by the other partners, a partner may bring a claim belonging to the partnership. *Gillespie*, 2016 NCBC LEXIS 69, at *21–22. However, "[i]t is clear under North Carolina law that 'one partner may not sue in *his own name, and for his benefit,* upon a cause of action in favor of a partnership.'" *Id.* at *21 (quoting *Godwin v. Vinson*, 251 N.C. 326, 327, 111 S.E.2d 180, 181 (1959)). Plaintiff's self-dealing and misappropriation claim alleges that Plaintiff—not the partnership—"is entitled to revenues and profits relating thereto received by [Clay], [Rick] or Neill Grading" and that Plaintiff "is owed and was damaged . . . due to [Clay]'s self-dealing and misappropriation[.]" (First Am. Compl. ¶¶ 185, 187.) Thus, even assuming arguendo that Plaintiff may assert a claim belonging to the partnership, Plaintiff's Second Claim fails to assert such a claim as it seeks only individual relief.

67. In short, to the extent that Plaintiff's Second Claim brings an individual claim for self-dealing and misappropriation of corporate opportunities, this claim is properly pleaded as a breach of fiduciary duty claim, and Plaintiff's additional claim for self-dealing and misappropriation is duplicative. *See Plasman*, 2016 NCBC LEXIS 80, at *38 ("Misappropriation of corporate opportunity 'is a species of the duty of a fiduciary to act with undivided loyalty . . . .'" (quoting *Meiselman*, 309 N.C. at 307, 307 S.E.2d at 568)). To the extent that Plaintiff's Second Claim brings a partnership claim, this claim must fail as it seeks to recover damages sustained by Plaintiff, rather than by the partnership generally. Therefore, Defendants' Rule 12(c) Motion as to Plaintiff's Second Claim is granted.

## IV. MOTION TO AMEND

68. Plaintiff requests leave to amend his First Amended Complaint pursuant to Rules 15, 19, and 20 to add Edward C. Neill ("Edward") and Hollar Hosiery Development, LLC ("Hollar Hosiery Development") as defendants, assert additional factual allegations, and add claims for libel, unfair and deceptive trade practices, and piercing the corporate veil and joint and several liability. (Mot. Amend First Am. Compl. ¶¶ 5, 12–14, ECF No. 61; Mot. Amend Ex. 1, at 39, 41, 43, ECF No. 66.) Plaintiff argues that the proposed amendments relate to events that have occurred since Plaintiff filed his First Amended Complaint and facts learned over the course of discovery. (Mem. Supp. Mot. Amend First Am. Compl. 1, ECF No. 64.) To the extent that the Motion to Amend is based on events that occurred after Plaintiff filed the First Amended Complaint, the Court properly considers the Motion under Rule 15(d). *See Foy v. Foy*, 57 N.C. App. 128, 132, 290 S.E.2d 748, 750 (1982). Otherwise, the Court considers the Motion to Amend under Rule 15(a).

### A. Rule 15(a)

69. Rule 15(a) provides that, after a responsive pleading has been served, a party may amend his pleading only by leave of court or by written consent of the adverse party, and "leave shall be freely given when justice so requires." N.C. Gen. Stat. § 1A-1, Rule 15(a). "The party objecting to the amendment has the burden of establishing it will be materially prejudiced by the amendment." *N. River Ins. Co. v. Young*, 117 N.C. App. 663, 671, 453 S.E.2d 205, 210 (1995). A motion for leave to amend is addressed to the sound discretion of the trial court. *E.g.*, *Draughon v.*

*Harnett Cty. Bd. of Educ.*, 166 N.C. App. 464, 467, 602 S.E.2d 721, 724 (2004). Reasons justifying denial of a motion to amend under Rule 15(a) are undue delay, bad faith, dilatory motive, repeated failure to cure defects by previous amendments, undue prejudice, and futility of amendment. *E.g.*, *JPMorgan Chase Bank, N.A. v. Browning*, 230 N.C. App. 537, 541, 750 S.E.2d 555, 559 (2013). "In deciding if there was undue delay, the trial court may consider the relative timing of the proposed amendment in relation to the progress of the lawsuit." *Draughon*, 166 N.C. App. at 467, 602 S.E.2d at 724. "[A] trial court may appropriately deny a motion for leave to amend on the basis of undue delay where a party seeks to amend its pleading after a significant period of time has passed since filing the pleading and where the record or party offers no explanation for the delay." *Rabon v. Hopkins*, 208 N.C. App. 351, 354, 703 S.E.2d 181, 184 (2010).

70. "Where the essence of a Rule 15(a) motion to amend a pleading is to add a party to the lawsuit, consideration of [Rules] 20 and 21 is required." *Coffey v. Coffey*, 94 N.C. App. 717, 721, 381 S.E.2d 467, 470 (1989). Under Rule 20(a), defendants may be joined in one action "if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all parties will arise in the action." N.C. Gen. Stat. § 1A-1, Rule 20(a); *Coffey*, 94 N.C. App. at 721, 381 S.E.2d at 470. Under Rule 21, "parties may be dropped or added by order of the court on motion of any party or on its own initiative at any stage of the action." N.C. Gen. Stat. § 1A-1, Rule 21.

71. The Court concludes that Plaintiff's Motion to Amend is the product of undue delay. Plaintiff filed the Motion to Amend one year and eight months after he filed his original Complaint, and one year and three months after he filed his First Amended Complaint. In addition, Plaintiff contends that the Motion to Amend is based on facts learned through discovery; however, Plaintiff fails to offer any support for this contention. In his brief in support of the motion, Plaintiff states that "[i]n discovery, [Plaintiff] learned that Clay formed an entity called [Hollar Hosiery Development], but did not disclose such entity to [Plaintiff]," (Mem. Supp. Mot. Amend 8), but, there is no citation for this statement. Further, Plaintiff asserts that "[t]he deposition of [Clay] occurring on April 13, 2017 revealed that Neill Grading is operated as an alter ego of the Neill family including Clay and [Edward,]" and that "Clay's testimony supports that ordinary corporate formalities were not followed, including co-mingling of funds without documenting such." (Mem. Supp. Mot. Amend 13.) Neither of these assertions contains a citation to the record, but the excerpts of Clay's deposition that were submitted with the Motion to Amend do not appear to support either assertion. In sum, Plaintiff's briefs in support of the Motion to Amend are replete with statements that numerous material facts were learned through discovery, but for which there is either no citation to the record or an unsupportive citation. *See Strickland v. Lawrence*, 176 N.C. App. 656, 667, 627 S.E.2d 301, 308 (2006) ("Plaintiffs sought to add the claim for civil conspiracy 'based upon information that has been obtained in discovery,' however, at the hearing on plaintiffs' motion to amend, plaintiffs presented no deposition transcripts or other documentary evidence,

other than the pleadings, to support their motion. Based on these circumstances alone, plaintiffs cannot show that the trial court abused its discretion in denying the motion based on undue delay.").

72. The Court further concludes that the timing and nature of Plaintiff's Motion to Amend suggest a dilatory motive. On September 14, 2016, the Court entered a Case Management Order. (ECF No. 27.) Pursuant to the Case Management Order, the parties were to complete fact discovery by April 14, 2017 and expert discovery by June 14, 2017. (Case Management Order 12.) On April 14, 2017—the last day of fact discovery—Plaintiff filed a Motion to Extend Case Management Deadlines, requesting a ninety-day extension of the deadlines set forth in the Case Management Order. (ECF No. 44.) On April 18, 2017, the Court entered an order granting the motion in part and extending the discovery deadlines an additional six weeks. (ECF No. 46.) The order found that "the parties, and especially Plaintiff, ha[d] not been diligent in conducting discovery in this case." (Order Mot. Extend Case Mgmt. Deadlines ¶ 10.) The Court explained that "Plaintiff waited four months after the entry of the Case Management Order to serve his first set of interrogatories and request for production and waited until the day before the end of fact discovery to take his first deposition, the deposition of the named defendant." (Order ¶ 10.) Nevertheless, the Court extended the fact discovery deadline to and including May 26, 2017, but the order expressly stated that "[t]he discovery period shall not be further extended absent extraordinary cause." (Order 4.)

73. On June 14, 2017—after the fact discovery deadline—the parties filed a Consent Motion to Amend Case Management Order. (ECF No. 57.) The motion sought a second amendment to the Case Management Order to allow Plaintiff to take Neill Grading's deposition on July 12, 2017, and to extend the expert discovery deadline to and including October 11, 2017. The Court denied these requests by order dated June 15, 2017. (ECF No. 58.) Later that day, the parties filed a Joint Consent Motion to Reconsider and Amended Motion to Amend Case Management Order. (ECF No. 59.) The Court denied the parties' June 15 motion by order dated June 16, 2017. (ECF No. 60.) Soon thereafter, on that same day, Plaintiff filed the Motion to Amend. Although Plaintiff states that the amendment would not require additional discovery, Plaintiff should know full well that the Court could not permit Plaintiff to add new parties as defendants in this action without permitting those new party-defendants to obtain discovery. *See Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 280 (4th Cir. 2013) ("Chief among its errors was the district court's award of summary judgment to [plaintiff] without allowing [defendant] any discovery. As a general proposition, summary judgment is appropriate only after adequate time for discovery. . . . A district court therefore must refuse summary judgment where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition." (third alteration in original) (citations and quotation marks omitted)).

74. Therefore, the Court concludes, in its discretion, that the Motion to Amend, to the extent that it is brought under Rule 15(a), should be denied based on Plaintiff's

undue delay and dilatory motive. *Media Network, Inc. v. Long Haymes Carr, Inc.*, 197 N.C. App. 433, 447−48, 678 S.E.2d 671, 681 (2009) (affirming trial court's denial of defendant's motion to amend when the motion was filed almost four months after defendant filed its original answer and defendant did not offer any credible explanation for the delay); *Walker v. Sloan*, 137 N.C. App. 387, 402, 529 S.E.2d 236, 247 (2000) (affirming trial court's denial of plaintiffs' motion to amend based on undue delay when the motion was made five months after plaintiffs filed their original complaint and there was nothing in the record to explain why plaintiffs were delayed in moving to amend); *Johnson v. Beverly-Hanks & Assocs., Inc.*, 97 N.C. App. 335, 341, 388 S.E.2d 584, 587 (1990) (affirming trial court's denial of plaintiffs' motion to amend based on undue delay when the motion was made seven months after plaintiffs filed their original complaint and there was nothing in the record to indicate why plaintiffs were delayed in moving to amend).

### B. Rule 15(d)

75. The Motion to Amend also seeks to add allegations regarding statements made during a June 19, 2016 meeting between Plaintiff's parents, Nancy and David Zagaroli, on the one hand, and Clay, Edward, and Rick, on the other hand (the "June 19 Meeting"). (Mot. Amend Ex. 1, at 39−41.) As the proposed allegations concern events that occurred after the filing of the First Amended Complaint, the Motion to Amend based on these allegations must be considered under Rule 15(d).

76. Rule 15(d) provides that "[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit him to serve a

supplemental pleading setting forth transactions or occurrences or events which may have happened since the date of the pleading sought to be supplemented[.]" N.C. Gen. Stat. § 1A-1, Rule 15(d). A motion to serve a supplemental pleading is left to the discretion of the trial court. *Brackett v. SGL Carbon Corp.*, 158 N.C. App. 252, 258, 580 S.E.2d 757, 761 (2003). Indeed, the language of Rule 15(d) "permits but does not require a trial court to allow a supplemental pleading." *Deutsch v. Fisher*, 32 N.C. App. 688, 692, 233 S.E.2d 646, 649 (1977). Our courts have stated that "motions to allow supplemental pleadings should be freely granted unless their allowance would impose a substantial injustice upon the opposing party." *Miller v. Ruth's of N.C., Inc.*, 69 N.C. App. 153, 156, 316 S.E.2d 622, 625 (1984); *see Draughon v. Harnett Cty. Bd. of Educ.*, 166 N.C. App. 449, 454, 602 S.E.2d 717, 720 (2004) ("Motions to allow supplemental pleadings should ordinarily be granted because by definition they encompass matters that arose after the date of the original pleading, unless a substantial injustice would result to the opposing party."). This rule is "based upon the policy that a party should be protected from the harm which may occur if he is prevented from litigating certain issues merely by virtue of the court's denial of such a motion." *vanDooren v. vanDooren*, 37 N.C. App. 333, 337, 246 S.E.2d 20, 23–24 (1978). In considering a motion to allow supplemental pleadings, courts "should focus on any resulting unfairness which might occur to the party opposing the motion." *Id.* at 337, 246 S.E.2d at 24.

77. Unlike motions to amend under Rule 15(a), North Carolina courts have not specifically articulated the grounds that justify denying a motion to supplement a

pleading under Rule 15(d). Our courts have held that, as with a motion to amend under Rule 15(a), futility is a proper justification for denying a motion to file a supplemental pleading, *Brackett*, 158 N.C. App. at 258, 580 S.E.2d at 761, but that "mere delay, standing alone, is not a sufficient reason to deny [a] motion" under Rule 15(d), *vanDooren*, 37 N.C. App. at 338, 246 S.E.2d at 24. Additionally, federal decisions interpreting Rule 15(d) of the Federal Rules of Civil Procedure, which is substantially similar to Rule 15(d) of the North Carolina Rules, have concluded that motions to supplement a pleading under Federal Rule 15(d) are governed by the same standard as motions to amend under Federal Rule 15(a). *Franks v. Ross*, 313 F.3d 184, 198 n.15 (4th Cir. 2002) ("[T]he standards used by a district court in ruling on a motion to amend or on a motion to supplement are nearly identical.").

78. For the same reasons discussed above with respect to the Motion to Amend under Rule 15(a), and as further explained below with respect to the motion under Rule 15(d) based on the June 19 Meeting, the Court concludes that the timing and nature of Plaintiff's Motion to Amend under Rule 15(d) suggest a dilatory motive. Plaintiff did not move to supplement his First Amended Complaint until one full year, less three days, after the June 19 Meeting. Plaintiff states in his affidavit that he "was aware either Clay or Rick requested [Plaintiff] not be" at the June 19 Meeting, but that he "did not discuss the detailed statements" made by Clay, Edward, and Rick to Plaintiff's parents during that meeting and that he "was not aware of most things said in the meeting." (Pl.'s Reply to Defs.' Br. Opp'n Pl.'s Mot. Leave to Amend Ex. E, ¶¶ 2, 5, ECF No. 88.) Plaintiff states that during Clay's deposition on April 13,

2017, Plaintiff heard Clay's testimony regarding the June 19 Meeting, and that in early June 2017, Plaintiff's father "authorized [Plaintiff] to listen to a recording of the [June 19 Meeting.]" (Pl.'s Reply Ex. E, ¶ 5.) At the hearing on the Motions, the Court inquired of counsel for Plaintiff, Mr. Rogers, about the recording. Mr. Rogers responded that he knew of the recording's existence pursuant to his attorney-client relationship with Plaintiff's father. As a result, Mr. Rogers stated that he did not think it was appropriate, at least until sometime in early June 2017, to discuss the recording with Plaintiff. It is unclear what occurred between the June 19 Meeting and early June 2017 that led Plaintiff's father to allow Plaintiff to listen to the recording. Nevertheless, for all the reasons discussed above, the Court finds that Plaintiff obtaining permission in June 2017—almost a full year after the June 19 Meeting—to listen to the recording of that meeting is a product of Plaintiff's dilatory motive. Indeed, during Plaintiff's deposition of Clay on April 13, 2017—two months before Plaintiff both listened to the recording and filed the Motion to Amend— Plaintiff's counsel inquired in detail about the June 19 Meeting, and his inquiries parallel the proposed amendments, strongly suggesting that he was aware of what was allegedly said during the June 19 Meeting. (Pl.'s Reply Ex. D, at 321–27, ECF No. 88.) For example, Plaintiff's counsel asked Clay the following questions:

> Q. Now, you told the Zagarolis that the reason why Hollar didn't happen was because [Plaintiff] was taking money under the table and that was the reason why it went to hell; is that right?
>
> A. That's correct.
>
> . . . .

Q. Okay. Now, did you guys tell the Zagarolis that your father was willing to lend you up to $20 million to fight [Plaintiff] in this lawsuit?

A. He may have made a comment to that extent.

(Pl.'s Reply Ex. D, at 323:10–14, 325:20–23.) Based on the foregoing, the Court concludes, in its discretion, that the Motion to Amend under Rule 15(d) is a product of Plaintiff's dilatory motive.

79. The Court further concludes that allowing Plaintiff's supplemental pleading would unfairly prejudice Defendants. The discovery deadline has passed, and Plaintiff's contention that no further discovery is necessary is without merit. (Pl.'s Reply to Defs.' Br. Opp'n Pl.'s Mot. Leave to Amend 12, ECF No. 85.) Defendants deposed Nancy Zagaroli on or about September 19, 2016, (Defs.' Br. Opp'n Pl.'s Mot. Leave to Amend 16, ECF No. 83; Pl.'s Reply 12), but Defendants did not question Nancy Zagaroli regarding the June 19 Meeting as the First Amended Complaint does not assert claims pertaining to that meeting, (Defs.' Br. Opp'n 16). Defendants did not depose David Zagaroli. (Defs.' Br. Opp'n 16; Pl.'s Reply 12.) Defendants would need to conduct additional discovery relating to the June 19 Meeting, which would inevitably lead to additional costs. Further, as explained above, Edward cannot be added as a defendant without allowing him the opportunity to conduct discovery.

80. As an alternative ground for denying the Motion to Amend under Rule 15(d), the Court concludes that the amendment would be futile. Plaintiff's Proposed Second Amended Complaint seeks to assert claims for slander *per se* and slander *per quod* based on statements allegedly made during the June 19 Meeting. "In order to recover for defamation, a plaintiff must allege that the defendant caused injury to the

plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." *Eli Global, LLC v. Heavner*, 794 S.E.2d 820, 824 (N.C. Ct. App. 2016). Oral defamation may be categorized as either slander *per se* or slander *per quod*. *Izydore v. Tokuta*, 242 N.C. App. 434, 445, 775 S.E.2d 341, 349 (2015). Slander *per se* is "an oral communication to a third party which amounts to (1) an accusation that the plaintiff committed a crime involving moral turpitude; (2) an allegation that impeaches the plaintiff in his trade, business, or profession; or (3) an imputation that the plaintiff has a loathsome disease." *Id.* "Slander *per quod* involves a spoken statement of which the harmful character does not appear on its face as a matter of general acceptance, but rather becomes clear 'only in consequence of extrinsic, explanatory facts showing its injurious effect . . . .'" *Donovan v. Fiumara*, 114 N.C. App. 524, 527, 442 S.E.2d 572, 574–75 (1994) (omission in original) (quoting *Badame v. Lampke*, 242 N.C. 755, 757, 89 S.E.2d 466, 467–68 (1955)). When statements are slanderous *per se*, both malice and damages are presumed as a matter of law. *Izydore*, 242 N.C. App. at 445, 775 S.E.2d at 349. Conversely, to state a slander *per quod* claim, plaintiff must plead both the injurious character of the words and special damages. *Id.*

81. The Proposed Second Amended Complaint contains a number of conclusory allegations. (*E.g.*, Mot. Amend Ex. 1, ¶ 337 ("[Edward], Clay and [Rick] . . . told David and Nancy many statements over the course of approximately an hour which statements are objective [sic] false and were intended to impeach [Plaintiff] in his trade and profession.").) These generalized allegations are insufficient to state a

slander claim as a matter of law. *See Izydore*, 242 N.C. App. at 446, 775 S.E.2d at 349 ("[A]llegedly slanderous remarks need not be repeated verbatim, but they must be alleged substantially in *haec verba*, or with sufficient particularity to enable the court to determine whether the statement was defamatory." (quotation marks omitted)). Thus, in determining whether the amendment would be futile, the Court considers only those non-conclusory allegations of the Proposed Second Amended Complaint.

82. With respect to the June 19 Meeting, the proposed complaint alleges the following:

- "Clay, [Edward], and [Rick] intentionally mischaracterized payments made to [Plaintiff] as 'taking money under the table' and [Plaintiff] being 'caught' by Meg Locke." (Mot. Amend Ex. 1, ¶ 339.)

- "[Edward] stated that 'we could've sued [Plaintiff]' for taking money from James Maynard 'under the table.'" (Mot. Amend Ex. 1, ¶ 341.)

- "[Edward] accused [Plaintiff] of forging checks . . . ." (Mot. Amend Ex. 1, ¶ 342.)

- "Clay stated that [Plaintiff] lost his General Contractors license because [Plaintiff] owed everybody . . . ." (Mot. Amend Ex. 1, ¶ 343.)

- "Clay stated that [Plaintiff] forged Clay's signature and that Clay never authorized [Plaintiff] to sign his signature . . . ." (Mot. Amend Ex. 1, ¶ 347.)

- "[Edward] told the [sic] David and Nancy that Neill Grading was forced to become the general contractor for Hollar Mill and to exclude [Plaintiff] . . . ." (Mot. Amend Ex. 1, ¶ 349.)

Plaintiff alleges that Defendants made the above statements "intending to impeach [Plaintiff] in his profession and with regard to Reclamation." (Mot. Amend Ex. 1, ¶ 336.)

83. Whether a statement is slanderous *per se* is a question of law for the Court. *Eli Global, LLC*, 794 S.E.2d at 825. "[T]he policy of the law has much restricted the range of defamatory utterances which are actionable *per se*." *Donovan*, 114 N.C. App. at 528, 442 S.E.2d at 575. Words are defamatory *per se* when they are "susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided." *Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 30–31, 568 S.E.2d 893, 898–99 (2002) (quoting *Flake v. News Co.*, 212 N.C. 780, 786, 195 S.E. 55, 60 (1938)). The Court must consider the statement in its full context. *Id.* at 31, 568 S.E.2d at 899. In order for false words to be actionable *per se* on the basis that it impeaches plaintiff in his business,

> the false words (1) must touch the plaintiff in his special trade or occupation, and (2) must contain an imputation necessarily hurtful in its effect on his business. That is to say, it is not enough that the words used tend to injure a person in his business. To be actionable *per se*, they must be uttered of him in his business relation. Defamation of this class ordinarily includes charges made by one trader or merchant tending to degrade a rival by charging him with dishonorable conduct in business.

*Eli Global, LLC*, 794 S.E.2d at 825 (quoting *Badame*, 242 N.C. at 757, 89 S.E.2d at 468).

84.     The Court concludes that, even taking the allegations of the Proposed Second Amended Complaint in the light most favorable to Plaintiff, the statements allegedly made by Defendants to Plaintiff's parents are not slanderous *per se*.  The statement to Plaintiff's parents that Plaintiff forged checks and took money under the table does not touch Plaintiff in his special trade or occupation, and it does not contain an imputation necessarily hurtful to Plaintiff's business.  This is akin to a charge that Plaintiff is dishonest, and "[o]ur Courts have held that 'alleged false statements . . . calling plaintiff dishonest or charging that plaintiff was untruthful and an unreliable employee, are not actionable *per se*.'"  *Izydore*, 242 N.C. App. at 445, 775 S.E.2d at 349 (omission in original).   Thus, as Defendants' alleged statements are only actionable *per quod*, Plaintiff must allege special damages.  *Id.*

85.     "In the context of an action for defamation, special damage means pecuniary loss; emotional distress and mental suffering are not alone sufficient . . . ." *Donovan*, 114 N.C. App. at 527, 442 S.E.2d at 575 (omission in original) (citations and quotation marks omitted).  The Proposed Second Amended Complaint contains the following allegations regarding special damages:

> 456. [Clay] and/or [Rick] accusing [Plaintiff] of crimes relating to his profession and business establish a presumption of malice and legal injury and damage for which [Plaintiff] is entitled to punitive, compensatory and special damages in excess of $30,000.00.
>
> . . . .

459. Plaintiff's reputation has been smeared, and his ability to earn a living have [sic] been harmed by Clay and [Edward]'s defamation of Plaintiff.

460. [Plaintiff] has incurred special damages, including without limitation Defendants intentionally causing severe personal stress, as well as stress to [Plaintiff]'s personal and familial relationships.

461. [Plaintiff] is entitled to damages including without limitation special and punitive damages exceeding $30,000.00 relating to Defamation.

(Mot. Amend Ex. 1, ¶¶ 456, 459–61.)

86.     Plaintiff has failed to allege any special damages to sustain his slander *per quod* claim. Allegations of personal stress and harm to reputation are insufficient as a matter of law to establish a basis for relief. *See Johnson v. Bollinger*, 86 N.C. App. 1, 11, 356 S.E.2d 378, 384–85 (1987) ("In order to prove special damages from defamation, plaintiff's allegations must evidence a pecuniary loss rather than simple humiliation. Emotional distress and mental suffering are not sufficient allegations to establish a basis for relief in cases which are only actionable *per quod*." (citation omitted)). Further, Plaintiff's conclusory allegation that "his ability to earn a living have [sic] been harmed[,]" without more, is insufficient to inform Defendants of the scope of Plaintiff's demand. *See Skinner v. Reynolds*, 237 N.C. App. 150, 157, 764 S.E.2d 652, 658 (2014) ("The conclusory allegation that [plaintiff] suffered unspecified 'lost wages' and 'expenses' associated with 'mitigating the defamation' is insufficient to inform defendants of the scope of [plaintiff's] claim."); *Griffin v. Holden*, 180 N.C. App. 129, 138, 636 S.E.2d 298, 305 (2006) ("[S]pecial damages . . . must be pleaded,

and the facts giving rise to the special damages must be alleged so as to fairly inform the defendant of the scope of plaintiff's demand.").

87.     Therefore, the Court concludes that the Motion to Amend under Rule 15(d) would be futile and, as such, is denied.

## V.     CONCLUSION

88.     For the foregoing reasons, the Court **ORDERS** as follows:

A.     The Court **DENIES** Defendants' Rule 12(c) Motion as to Plaintiff's Third and Fifth Claims.

B.     The Court **GRANTS** Defendants' Rule 12(c) Motion as to Plaintiff's Second Claim, and this claim is dismissed with prejudice.

C.     The Court **DENIES** Plaintiff's Motion to Amend.

**SO ORDERED**, this the 7th day of November, 2017.

/s/ Michael L. Robinson
_____
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases